(203 P.3d 76)

No. 99,528

TODD L. MITCHELL, *Appellee/Cross-appellant,* v. PETSMART, INC., *Appellant/Cross-appellee,* ROYAL & SUN ALLIANCE INSURANCE COMPANY, *Appellee/Cross-appellee,* and TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA, *Appellant/Cross-appellee.*

Opinion filed March 20, 2009.

*Brian R. Collignon* and *Lyndon W. Vix,* of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellant/cross-appellee Petsmart, Inc., and appellant/cross-appellee Travelers Property and Casualty Company of America.

*Michael L. Snider,* of Snider & Stewart, L.L.C. of Wichita, for appellee/cross-appellant Todd L. Mitchell.

*Terry J. Torline* and *Timothy A. Emerson,* of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellant/cross-appellee Petsmart, Inc., and appellee/cross-appellee Royal & Sun Alliance Insurance Company.

Before HILL, P.J., MALONE and CAPLINGER, JJ.

CAPLINGER, J.: Petsmart, Inc., and Travelers Property Casualty Company of America appeal the decision of the Workers Compensation Board (Board) claiming the Board erred in determining

the date of accident for Mitchell's repetitive trauma injuries and assessing joint and several liability between Travelers and Royal & Sun Alliance Insurance Company for those injuries. Claimant Todd Mitchell cross-appeals, alleging the Board erred in combining the functional impairment ratings for his right and left arm injuries into one functional impairment rating and one scheduled injury for each arm. Mitchell also claims the Board erred in deducting his temporary total disability (TTD) benefits from the permanent partial disability (PPD) award for his right arm injury.

We conclude substantial competent evidence supports the Board's determination that Mitchell's subsequent repetitive trauma injuries resulted from a combination of overcompensation for his initial thumb injury and repetitive use of his upper extremities. Therefore, the Board did not err in determining the dates of accident for each of Mitchell's repetitive trauma injuries were separate and distinct from the date of accident for his initial thumb injury.

Further, on Mitchell's cross-appeal, we conclude the Board did not err in interpreting K.S.A. 44-510d to permit compensation at the highest level of injury when multiple injuries within a single extremity occur. And finally, we affirm the Board's deduction of the number of weeks of Mitchell's TTD from the maximum number of scheduled weeks of PPD in arriving at the total number of weeks of compensation under K.S.A. 44-510d.

*Factual history*

Mitchell worked for Petsmart from July 2002 until July 19, 2005. His duties included building store displays, assisting customers, and stocking merchandise, including 20-50 pound bags of dog food.

On December 31, 2003, Mitchell fell at work and broke his left thumb. He had surgery on January 7, 2004, and immediately returned to work with a cast on his left arm and restrictions against using his left thumb. Mitchell wore the cast for about 13 weeks but continued his regular duties at Petsmart, lifting primarily with his right arm.

Mitchell was released from all medical restrictions on April 5, 2004. Nevertheless, according to Mitchell, he continued to lift pri-

marily with his right arm because of continued swelling and stiffness in his left arm. At Mitchell's attorney's request, Mitchell was examined by Dr. Pedro Murati in May 2004. Dr. Murati determined Mitchell sustained a 32% permanent impairment to his left hand.

By July 18, 2004, Mitchell began experiencing numbness in both hands and sharp pain in his right shoulder. At Petsmart's direction, Mitchell was seen by Dr. Mark Dobyns, who treated him with ibuprofen and cortisone shots, referred him for physical therapy, and restricted Mitchell's use of his right arm. Mitchell continued his regular duties at Petsmart, lifting primarily with his left arm.

Dr. Murati again examined Mitchell on October 18, 2004, and diagnosed probable right carpal tunnel syndrome, with pain into the right shoulder, and a right shoulder rotator cuff sprain or tear.

On October 20, 2004, Mitchell notified Petsmart of pain in his left arm and shoulder. In November 2004, Petsmart transferred Mitchell's treatment to Dr. Bernard Hearon, who diagnosed a superior labrum anterior to posterior (SLAP) lesion to Mitchell's right shoulder. Mitchell had surgery on his right shoulder on January 3, 2005, and remained off work for a few weeks thereafter. When Mitchell returned to work with restricted use of his right arm, he continued his regular duties primarily using his left arm and continued to experience pain in his left arm and shoulder.

In February 2005, Dr. Hearon diagnosed a SLAP lesion in Mitchell's left shoulder. In July 2005, Dr. Hearon diagnosed bilateral carpal tunnel syndrome, possible bilateral cubital tunnel syndrome, and probable right cubital tunnel syndrome.

Petsmart terminated Mitchell's employment for poor attendance on July 19, 2005. The last day Mitchell performed work at Petsmart was July 15, 2005.

Mitchell underwent right carpal tunnel release surgery on August 15, 2005, and was given a full medical release by Dr. Hearon on September 27, 2005.

Dr. Murati again examined Mitchell on December 21, 2005, and assigned the following permanent impairment ratings: Right upper extremity — 36%; Left upper extremity — 15%; and whole person

— 29%. According to Dr. Murati, Mitchell also had an 86% job task loss.

*Procedural history*

At the time of Mitchell's left thumb injury on December 31, 2003, Petsmart was insured by Royal & Sun Alliance Company (Royal). However, Travelers began insuring Petsmart on February 1, 2004. Mitchell filed a timely workers compensation claim against Petsmart and Royal in March 2004, listing December 31, 2003, as the date of accident and seeking recovery for injuries to his "hand, thumb, arm and all parts affected thereby." On October 25, 2004, Mitchell amended his original claim against Royal to indicate that the date of accident was December 31, 2003, "and aggravated thereafter," seeking recovery for injuries to his "thumb, bilateral hands, bilateral shoulders, arms and all body parts affected."

Mitchell also filed a separate claim against Royal on October 25, 2004, seeking recovery for injuries from "overuse at work" to his "bilateral hands, shoulders and all parts affected." Mitchell indicated these injuries occurred on July 18, 2004, and each day worked thereafter. Travelers was later named as the insurance carrier on this second claim, and the two claims were consolidated for litigation.

Dr. Pat Do, who was appointed by the administrative law judge (ALJ) to perform an independent medical examination, testified that Mitchell's repetitive trauma injuries "arose out of his left thumb injury" and assigned the following permanent impairment ratings: Left thumb — 9%; Left hand — 4%; Left upper extremity — 5%; Right upper extremity — 13%; and whole person —10%.

Based on his May 2004 examination of Mitchell, Dr. Murati testified that Mitchell's left thumb and hand pain resulted from the thumb injury Mitchell sustained on December 31, 2003. However, based upon his October 2004 and December 2005 examinations, Dr. Murati testified Mitchell's repetitive trauma injuries resulted from a work-related injury occurring in July 2004.

The ALJ concluded: (1) Mitchell sustained a single, work-related injury on December 31, 2003, when he broke his left thumb; (2) Mitchell's subsequent repetitive trauma injuries were the natural

and probable consequences of the thumb injury; (3) Travelers and Royal were jointly and severally liable for all of Mitchell's injuries; (4) Mitchell made a good faith effort to find other employment after Petsmart terminated his employment; and (5) Mitchell experienced a 20% whole body impairment, a 25% wage loss, and an 86% job task loss, resulting in a 55% work disability. The ALJ awarded Mitchell 228.25 weeks of PPD compensation at the rate of $373.95 per week for a total award of $85,354.09.

On review, the Board concluded Royal was solely responsible for costs and compensation for Mitchell's 44.5% impairment to his left thumb and that compensation was to be paid for his thumb as a scheduled injury under K.S.A. 44-510d. Regarding Mitchell's repetitive trauma injuries, however, the Board concluded that *"the combination of claimant's work activities and his initial thumb injury* resulted in claimant developing bilateral carpal tunnel syndrome, right elbow symptoms, and bilateral shoulder injuries." Therefore, the Board found Royal and Travelers jointly and severally liable for the medical treatment and the disability compensation relative to those injuries. Finally, the Board designated Mitchell's last day of work, July 15, 2005, as the date of accident for the repetitive trauma injuries.

A majority of the Board determined the repetitive injuries should be compensated as scheduled injuries under K.S.A. 44-510d and that Mitchell suffered a 24.5% impairment to the right upper extremity at the shoulder level and an 8% impairment to the left upper extremity at the shoulder level. Two board members dissented, concluding that "[b]ecause the fingers, hand, forearm, arm and shoulder are each contained within the schedule of K.S.A. 44-510d(a), claimant's disabilities must each be compensated according to the schedule at the level that corresponds to that injury, regardless of whether the injuries occurred separately, simultaneously or as a result of a natural progression."

Travelers appeals the Board's determination, arguing the Board erred in calculating the date of the accident for the repetitive trauma injuries to be July 15, 2005, and imposing joint and several liability for those injuries between Travelers and Royal based upon that error.

Mitchell cross-appeals, arguing the Board erred in combining the functional impairment ratings for his right and left arm injuries into one functional impairment rating and one scheduled injury for each arm. Mitchell also claims the Board erred in deducting his TTD benefits from the PPD award for his right arm injury.

No party contests the Board's determination that Petsmart was insured by Royal on December 31, 2003, and that Royal is solely responsible for costs and compensation for the injury to Mitchell's left thumb on December 31, 2003.

*Did the Board Err in Failing to Apply the Secondary Injury Rule?*

Travelers argues the secondary injury rule, as discussed and applied in *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 154 P.3d 494 (2007), required the Board to find that Mitchell's repetitive trauma injuries were a natural and probable consequence of his thumb injury. Consequently, Travelers contends the Board should have found the single date of accident for all of Mitchell's injuries was December 31, 2003, and that Royal was solely responsible for all costs and compensation for these injuries.

In its brief responding to Travelers' appeal, Royal argues substantial competent evidence supports the Board's determination that Mitchell sustained injuries in three separate accidents. Nevertheless, Royal suggests this court should find Travelers solely responsible for the two injuries that occurred during Travelers' period of coverage and reverse the Board's determination of joint and several liability between Royal and Travelers for Mitchell's repetitive trauma injuries. However, Royal did not cross-appeal the Board's assessment of joint and several liability, and we lack jurisdiction to consider this argument. See K.S.A. 60-2103(h) (appellee must file notice of cross-appeal from adverse rulings in order to obtain appellate review of those issues).

A. Standard of review

Appellate courts have statutory authority to review any action of the Board taken pursuant to the Workers Compensation Act in accordance with the Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.* Such review is

limited to questions of law. K.S.A. 2008 Supp. 44-556(a). We may grant relief if we determine the Board erroneously interpreted or applied the law or if the Board's factual findings are not supported by substantial competent evidence. K.S.A. 77-621(c)(4) and (c)(7).

Generally, questions regarding the date of the accident, causation of injuries, and insurance coverage on the date of the accident are fact questions. See, *e.g.*, *Wietharn v. Safeway Stores, Inc.*, 16 Kan. App. 2d 188, 195, 820 P.2d 719, *rev. denied* 250 Kan. 808 (1991) (whether an injury is a natural and probable result of a previous injury is generally a fact question). Our review of questions of fact in a workers compensation case is limited to whether, when reviewing the record as a whole, the Board's findings of fact are supported by substantial competent evidence, which is a question of law. *Casco*, 283 Kan. at 514.

B. The Secondary Injury Rule

The secondary injury rule provides "that when a primary injury under the Workmen's Compensation Act is shown to have arisen out of and in the course of employment every natural consequence that flows from the injury, including a new and distinct injury, is compensable if it is a direct and natural result of a primary injury." *Jackson v. Stevens Well Service*, 208 Kan. 637, 643, 493 P.2d 264 (1972).

Travelers argues the Board erred in finding that Mitchell's repetitive trauma injuries resulted from *"the combination of claimant's work activities and his initial thumb injury"* and in designating Mitchell's last day worked, July 15, 2005, as the date of accident for the repetitive trauma injuries. Travelers contends the secondary injury rule required the Board to find that Mitchell's repetitive trauma injuries were a direct and natural result of his thumb injury and, consequently, the Board erred in finding Royal and Travelers jointly and severally liable for costs and compensation related to the repetitive trauma injuries. According to Travelers, the facts of this case are indistinguishable from those in *Casco*, where the court applied the secondary injury rule.

In *Casco*, the claimant suffered a work-related, repetitive-use injury to his left shoulder. Because of the injury and the restrictions

associated with his subsequent surgery and treatment, the claimant used his right arm to perform his duties upon his return to work, which included repetitive tying, lifting, and carrying. After several months, the claimant began to experience pain in his right shoulder and was diagnosed with a possible rotator cuff tear in his right shoulder. The Board concluded the claimant suffered a new and separate injury to his right shoulder due to repetitive use and modified the award based on the schedule in K.S.A. 44-510d.

A panel of this court reversed, finding the Board ignored undisputed medical testimony regarding causation of the claimant's right shoulder injury. The panel concluded the right shoulder injury was a natural and probable consequence of the claimant's left shoulder injury and further held the award should be based on injuries to parallel limbs. See 283 Kan. at 513 (citing *Casco v. Armour Swift-Eckrich*, 34 Kan. App. 2d 670, 682-83, 128 P.3d 401 [2005]).

On petition for review, the employer in *Casco* raised two issues: whether the claimant's right shoulder injury was the natural and probable consequence of his left shoulder injury, and whether the claimant should receive compensation for a scheduled injury.

With respect to the first issue, our Supreme Court in *Casco* relied upon the Board's factual finding that the claimant was performing repetitive tasks and lifting only with his right arm because of restrictions that limited the use of his left arm. The court determined that even though the Board's factual findings were supported by substantial competent evidence, the Board placed undue emphasis on the claimant's expert's reference to Casco's work activities rather than his opinion linking the causation of Casco's right shoulder injury to his left shoulder injury. Thus, the court held the Board erroneously concluded the claimant's right shoulder injury was caused by repetitive use. 283 Kan. at 516-18. Notably, the court also concluded that the Board failed "to consider the uncontroverted evidence that Casco was carrying 20-25 pound boxes with only his right arm because he could not use his left arm." 283 Kan. at 520.

Ultimately, the *Casco* court applied the secondary injury rule and found the claimant's right shoulder injuries and left shoulder

injuries constituted a "single injury" for purposes of calculating the claimant's compensation award. 283 Kan. at 528.

In addressing the second issue, the *Casco* court overruled the parallel injury rule established in *Honn v. Elliott*, 132 Kan. 454, 295 Pac. 719 (1931), which permitted a claimant to "receive compensation based on a permanent partial general disability rather than scheduled injuries if the claimant simultaneously injures parallel members." *Casco*, 283 Kan. at 523, 527. The court then adopted the analytical model established in *Pruter v. Larned State Hospital*, 271 Kan. 865, 26 P.3d 666 (2001), to calculate the claimant's compensation when the claimant suffers a loss of both eyes, both hands, both arms, both feet, both legs, or any combination thereof. *Casco*, 283 Kan. at 525.

Travelers argues that here, as in *Casco*, the evidence was undisputed that Mitchell's subsequent injuries were a natural and probable result of the initial thumb injury and that application of the secondary injury rule required the Board to find only one date of accident—*i.e.*, December 31, 2003.

While we see clear similarities between the facts here and those in *Casco*, we cannot ignore the appreciable factual distinctions. For instance, it was undisputed in *Casco* that the plaintiff overcompensated because of his injury *and* the restrictions associated with the claimant's treatment for that injury. Here, Mitchell was deemed at maximum medical improvement and released to full duty on April 5, 2004, with *no* further restrictions. In fact, Mitchell's treating physician, Dr. Prince Chan, instructed him to use his left hand as a therapeutic measure.

Further, the *Casco* court concluded the Board ignored *undisputed* testimony that the claimant's secondary injury resulted from overcompensation. 283 Kan. at 517-20. Here, while Dr. Do opined that Mitchell's repetitive trauma injuries arose out of his initial left thumb injury, Dr. Do's testimony was not undisputed.

In fact, Dr. Do's conclusion arguably was compromised by his own inconsistent statements. Dr. Do was asked in cross-examination whether his causation opinion would be impacted if Mitchell had experienced a period of relief from his thumb injury before his shoulder pain started. Dr. Do testified:

"A. If he had—if there was a period of time that he had no pain at all, and I have no guidelines on time, like three months. That's pulling it out of the air. That's a guess. But if at the time he was using his right shoulder he was still in pain or still recovering from his left shoulder—I mean from his left thumb, then his right shoulder may have been aggravated from overuse of his left.

"Q. Do you recall getting any information from him in that regard? In other words, how his thumb was doing between April of 2004 and July of 2004?

"A. I think from his patient—from his report of what he told us, he was having shoulder pain while still in the cast or still recovering from the left thumb, so what—can I go beyond to clarify—

"Q. Sure.

"A. —this difficult situation?

"Q. Sure.

"A. So I suppose if he really was still in a cast—I guess what's key to this, if I can help you guys figure it out, if he was still in a cast, trying to go back to work with restrictions while still in the cast, using his right arm, I suppose that can aggravate a right shoulder complaint, *but if his right shoulder started hurting a lot when he's out of the cast, already at [maximum medical improvement] and no restrictions for the left thumb, then all of a sudden he starts having right shoulder pain, then it may be harder to say it was from the left thumb; but by his report to me, he was using his right shoulder while still in a cast, I believe, for his left hand.*" (Emphasis added.)

Thus, Dr. Do's opinion was conditioned upon his assumption that Mitchell began experiencing right arm pain while his left arm was still in a cast and Mitchell was working under restrictions. However, although Mitchell returned to work and primarily used his right arm while his left arm was in a cast, by April 5, 2004, he was no longer in a cast and was deemed to be at maximum medical improvement with *no* restrictions. Several months later, Mitchell complained of right shoulder injury.

Moreover, even the claimant questioned Dr. Do's conclusions, pointing out that he saw Dr. Do only briefly and "you know, I don't even know how he could come to any conclusion really within five minutes." And, as Royal points out, although Dr. Do's initial report of April 12, 2006, addressed causation, it did not conclude that any or all of Mitchell's repetitive injuries were caused by his initial thumb injury.

Further, unlike in *Casco*, other expert testimony supported the Board's finding that Mitchell suffered separate injuries. Claimant's physician, Dr. Murati, testified that Mitchell's repetitive trauma

injuries resulted from a work-related injury occurring in July 2004 when Mitchell began experiencing right shoulder pain. Dr. Murati also testified that repetitive trauma injuries, such as those sustained by Mitchell, "continue[d] to cause the claimant to sustain mini traumas each day he engage[d] in work activities."

Additionally, contrary to Travelers' suggestion, the Board did not ignore evidence establishing that Mitchell's repetitive trauma injuries were the natural and probable consequence of the initial thumb injury. Instead, the Board found that repetitive work and overcompensation contributed equally to cause Mitchell's injuries.

We must emphasize that the question of whether a second injury is compensable as a natural and probable consequence of the primary injury is dependent upon the facts of each case, and we are not permitted to substitute our judgment for that of the Board, even though some evidence may support a contrary finding. See *Graham v. Dokter Trucking Group*, 284 Kan. 547, 553-54, 161 P.3d 695 (2007).

We conclude substantial competent evidence supports the Board's determination that Mitchell's subsequent repetitive trauma injuries resulted from a combination of overcompensation for his initial thumb injury and repetitive use. Further, we note that the Board's decision to assign Mitchell's last day worked as the date of accident for his repetitive trauma injuries is consistent with established case law. See, *e.g.*, *Kimbrough v. University of Kansas Med. Center*, 276 Kan. 853, 855-57, 79 P.3d 1289 (2003) (discussing and applying the last-day-worked rule).

*Cross-Appeal: Did the Board Err in Calculating Mitchell's Compensation Award?*

In his cross-appeal, Mitchell argues the Board erred in combining the functional impairment ratings for his right and left arm injuries into one functional impairment rating and one scheduled injury for each arm. Mitchell also claims the Board erred in deducting his TTD benefits from the PPD award for his right arm injury.

Resolution of these issues requires interpretation of statutory provisions, case law, and administrative regulations, all of which

involve questions of law. Under the doctrine of operative construction, if a rational basis exists for the Board's interpretation of the law, the Board's interpretation is entitled to judicial deference and should be upheld on review. However, the Board's determination on questions of law is not conclusive and, though persuasive, is not binding on the court. *Casco*, 283 Kan. at 521.

A. Did the Board err in combining Mitchell's multiple scheduled injuries into one injury for each arm?

Under the Workers Compensation Act, compensation is calculated differently depending upon the nature of the disability. Temporary and permanent total disabilities are compensated under K.S.A. 44-510c; permanent partial scheduled disabilities are compensated under K.S.A. 44-510d; and permanent partial general disabilities are compensated under K.S.A. 44-510e. If an injury is included in the schedule of K.S.A. 44-510d, the amount of compensation in the schedule includes compensation for the permanent loss of the member or the partial loss of the member. K.S.A. 44-510d(a)(21).

K.S.A. 44-510d(a) provides, in part, that PPD compensation "is to be paid for not to exceed the number of weeks allowed in the following schedule:

"(1) For the loss of a thumb, 60 weeks.

. . . .

"(11) For the loss of a hand, 150 weeks.

"(12) For the loss of a forearm, 200 weeks.

"(13) For the loss of an arm, excluding the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures, 210 weeks, and for the loss of an arm, including the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures, 225 weeks."

In *Casco*, the court adopted the following analytical model for calculating compensation awards in multiple scheduled injury cases where a claimant suffers the loss of both eyes, both hands, both arms, both feet, both legs, or any combination thereof:

"The analysis begins with a determination of whether the claimant has suffered a permanent total disability. K.S.A. 44-510c(a)(2) establishes a rebuttable presumption in favor of permanent total disability when the claimant experiences a loss of both eyes, both hands, both arms, both feet, both legs, or any combination thereof.

If the presumption is not rebutted, the claimant's compensation must be calculated as a permanent total disability in accordance with K.S.A. 44-510c. *Pruter*, 271 Kan. at 875-76.

"If the presumption of permanent total disability is rebutted with evidence that the claimant is capable of engaging in any type of substantial and gainful employment, the claimant's award must be calculated as a permanent partial disability. See K.S.A. 44-510c(a)(2); *Pruter*, 271 Kan. at 875-76. Although both K.S.A. 44-510d and K.S.A. 44-510e apply to permanent partial disability, we note that eyes, hands, arms, feet, and legs are all included in the schedule. See K.S.A. 44-510d(a)(11)-(17). Because the legislature has made the schedule of injuries the general rule and permanent partial general disability the exception to the rule, the claimant's compensation must be calculated in accordance with the K.S.A. 44-510d for scheduled injuries. [Citation omitted.]" *Casco*, 283 Kan. at 527-28.

Here, a majority of the Board relied upon *Casco* to find that Mitchell's injuries should be compensated as separate scheduled injuries under K.S.A. 44-510d rather than a whole body injury under K.S.A. 44-510e. The parties do not dispute this determination. Nor do the parties dispute the Board's determination that Mitchell suffered a 44.5% impairment to his left thumb. Rather, in this cross-appeal, Mitchell challenges the Board's conclusion that he suffered a 24.5% impairment to the right upper extremity at the shoulder level and an 8% impairment to the left upper extremity at the shoulder level.

The Board calculated Mitchell's right upper extremity rating by averaging the functional impairment ratings of Dr. Do and Dr. Murati for the right arm other than shoulder and the right arm at shoulder level. Similarly, the Board calculated Mitchell's left arm upper extremity rating by averaging the ratings of Dr. Do and Dr. Murati for his left arm other than shoulder and his left arm at shoulder level. Thus, the Board combined the impairments in each of the claimant's right and left upper extremities into a single percentage of impairment for each upper extremity and then compensated the resulting impairment at the highest (shoulder) level.

Two dissenting members of the Board concluded that "[b]ecause the fingers, hand, forearm, arm and shoulder are each contained within the schedule of K.S.A. 44-510d(a), claimant's disabilities must each be compensated according to the schedule at the level that corresponds to that injury, regardless of whether the

injuries occurred separately, simultaneously or as a result of a natural progression."

Ultimately, the Board awarded Mitchell for three separate scheduled injuries, under K.S.A. 44-510d, as follows:

| | |
|---|---|
| Left thumb injury: | 26.70 weeks of PPD compensation at $373.95 per week based on a 44.5% impairment; |
| Left arm injury: | 18.00 weeks of PPD compensation (2.29 weeks at $384.23 per week plus 15.71 weeks at $426.89 per week) based on an 8% impairment for injuries to his left arm; |
| Right arm injury: | 18.00 weeks of TTD compensation (2.29 weeks at $384.23 per week plus 15.71 weeks at $426.89 per week) and 50.72 weeks of PPD at 426.89 per week based on a 24.5 % impairment. |

In arguing the Board erred in combining his multiple left arm and right arm injuries into one scheduled injury for each arm at the shoulder level, Mitchell relies upon three cases: *Pruter*, 271 Kan. 865; *Mathena v. IBP, Inc.*, 33 Kan. App. 2d 956, 111 P.3d 1060 (2005), and *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 515, 154 P.3d 494 (2007).

In *Pruter*, the claimant injured her right leg and right arm and the Board combined the two scheduled injuries into a whole body impairment, awarding the claimant partial general disability compensation under K.S.A. 44-510e. In reversing the Board, our Supreme Court held that in multiple scheduled extremity injury cases, claimants are to receive compensation for each permanent impairment to each body part according to the schedule in K.S.A. 44-510d(a). See 271 Kan. 865, Syl. ¶ 4.

In *Mathena*, the claimant injured her left shoulder, right hand, and right elbow. Relying on *Pruter*, the *Mathena* panel reversed the Board's award of work disability and remanded for a scheduled injury award based upon K.S.A. 44-510d. 33 Kan. App. 2d at 963.

Finally, in *Casco*, the claimant suffered injuries to his left and right shoulder. Relying on *Pruter*, the *Casco* court held that unless the ALJ found that the claimant was permanently and totally disabled, his injuries must be calculated as two scheduled injuries under K.S.A. 44-510d. 283 Kan. at 529.

*Pruter, Mathena* and *Casco* each concerned the more general issue of whether a claimant who is not permanently and totally disabled may nevertheless combine multiple impairments to extremities to create a whole body impairment. Those cases did not specifically address, however, the more narrow question presented here, *i.e.*, whether multiple impairments within the same extremity can be combined and compensated at the highest level for the scheduled impairments under K.S.A. 44-510d.

The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Winnebago Tribe of Nebraska v. Kline*, 283 Kan. 64, 77, 150 P.3d 892 (2007). When interpreting a statute, an appellate court's first task is to "ascertain the legislature's intent through the statutory language it employs." *State v. Stallings*, 284 Kan. 741, 742, 163 P.3d 1232 (2007).

Significantly, the schedule of injuries in K.S.A. 44-510d is progressive. For example, a claimant is entitled to 200 weeks for the loss of a forearm; 210 weeks for the loss of an arm, excluding the shoulder joint; and 225 weeks for the loss of an arm including the shoulder joint. K.S.A. 44-510d(a)(12)-(13); see, *e.g.*, *Landry v. Graphic Technology, Inc.*, 268 Kan. 359, Syl. ¶ 2, 2 P.3d 758 (2000) (correct measure of compensation for total loss of little finger and partial loss of bone extending from finger into the hand was based upon percentage of partial loss to the hand, which encompassed amputation of little finger); *McKinney v. Rodney Milling Co.*, 177 Kan. 401, 279 P.2d 221 (1955) (affirming award based upon loss of lower leg, including loss of foot and toes, where claimant's leg amputated at knee).

And while this case does not involve an amputation, we agree with Travelers' suggestion that the same principle applies to partial losses. As the court in *Casco* held: "If an injury is on the schedule, the amount of compensation in the schedule includes compensation for the complete loss of the member or the partial loss of the member." 283 Kan. at 522. Where only partial loss occurs, the number of weeks is reduced by the percentage of the loss. Thus, the principle of compensating an extremity at the highest level affected applies regardless of whether the loss is total or partial.

K.S.A. 44-510d(a)(13), which sets forth the number of weeks to be awarded for upper extremity injuries, demonstrates the application of this principle here. That statute provides:

"For the loss of use of an arm, excluding the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures, 210 weeks, and for loss of an arm, including the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures, 225 weeks." K.S.A. 44-510d(a)(13).

Here, because Mitchell sustained injury to his right arm, including the shoulder joint, the Board compensated him for 225 weeks pursuant to K.S.A. 44-510d(a)(13), less 18 weeks of TTD, as discussed below.

The Board's interpretation of K.S.A. 44-510d to permit compensation at the highest level of injury when multiple injuries within a single extremity occur is supported by a rational basis, and we affirm the award.

B. Did the Board err in deducting Mitchell's TTD award from the PPD award allowed under K.S.A. 44-510d?

The Board determined Mitchell was entitled to 18 weeks of TTD compensation for the combined injury to his right upper extremity, followed by 50.72 weeks of PPD. The Board arrived a this figure by deducting the number of weeks of TTD received by Mitchell (18) from the number of weeks provided for an arm injury at the shoulder level (225) pursuant to K.S.A. 44-510d(a)(13). This total, 207 weeks, was then multiplied by the percentage of disability, 24.5%, to determine that Mitchell was entitled to 50.72 weeks of PPD.

In his cross-appeal, Mitchell contends the Board erred in deducting the number of weeks of TTD from PPD. Although it is not entirely clear from his brief, claimant apparently would have the Board arrive at the number of weeks of PPD by multiplying 225 weeks by 24.5%. Mitchell claims the Board's deduction of the number of weeks of TTD compensation has no statutory or legal support. We disagree.

K.A.R. 51-7-8 clearly provides authority for this computation:

"(b) If a healing period of 10% of the schedule or partial schedule is granted, not exceeding 15 weeks, it shall be added to the weeks on the schedule or partial schedule before the following computations are made.

"(1) If a loss of use occurs to a scheduled member of the body, compensation shall be computed as follows:

(A) *deduct the number of weeks of temporary total compensation from the schedule*;

(B) multiply the difference by the percent of loss or use to the member; and

(C) multiply the result by the applicable weekly temporary total compensation rate." (Emphasis added.)

Administrative regulations have the force and effect of law. K.S.A. 77-425. In interpreting administrative regulations, we grant considerable deference to an agency's interpretation of its own regulation, which should not be disturbed unless that interpretation is clearly erroneous or inconsistent with the regulation. *Tonge v. Werholtz*, 279 Kan. 481, 484, 109 P.3d 1140 (2005).

The agency's interpretation of this regulation is also supported by case law. For instance in *Cowan v. Josten's American Yearbook Co.*, 8 Kan. App. 2d 423, 427, 660 P.2d 78 (1983), a panel of this court held:

"K.S.A. 44-510d(b) clearly directs that compensation paid for a specific injury under the schedule shall be *exclusive of all other compensation except the benefits* (medical compensation) *provided in* K.S.A. 44-510. In addition, K.S.A. 44-510d(a) specifies the types of compensation which may be awarded as including medical benefits provided in K.S.A. 44-510, temporary total compensation for loss of use and compensation for any permanent disability which finally results. *The disability dates from immediately after injury and a maximum number of weeks of compensation is set. Thus, any weeks of temporary total benefits count against the total number of weeks of benefits allowed.* [Citation omitted.]" (Emphasis added.)

Further, in *Rhea v. Kansas City Power & Light Co.*, 176 Kan. 674, 678, 272 P.2d 741 (1954), our Supreme Court agreed that the proper method of calculating PPD was to deduct the number of weeks of TTD from the maximum number of weeks of PPD fixed by the schedule and then multiply the percentage of disability by the remaining number of weeks.

Here, the Board's deduction of the number of weeks of Mitchell's TTD from the maximum number of scheduled weeks of PPD is supported by K.A.R. 51-7-8(b)(1)(A) and the case law interpreting K.S.A. 44-510d, and we will not disturb the Board's finding on appeal.

Affirmed.