No. 101,137

WILLIAM ALVIN REDD, *Appellee*, v. KANSAS TRUCK CENTER AND
UNIVERSAL UNDERWRITERS INS. CO., *Appellants*.

(239 P.3d 66)

Opinion filed September 10, 2010.

*James L. Mowbray*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered,
of Wichita, argued the cause, and *Michael D. Streit*, of the same firm, was with
him on the briefs for appellants.

*Roger A. Riedmiller*, of Law Office of Roger A. Riedmiller, of Wichita, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Kansas Truck Center and its insurance carrier challenge a workers compensation award to William Alvin Redd for permanent partial impairments to portions of his right and left upper extremities due to work-related injuries. The Workers Compensation Board ruled the injured worker's multiple right upper extremity impairments developed as a natural consequence of a 2003 crush injury to Redd's left hand and subsequent overcompensation use for that left hand injury. We hold there is substantial competent evidence supporting the Board's findings.

In making this determination, we address and resolve a conflict among Court of Appeals panels regarding the appropriate standard of review to employ when an agency's action is attacked as being unsupported by substantial competent evidence. This conflict arose following amendments in 2009 to the Kansas Judicial Review Act, see K.S.A. 2009 Supp. 77-601 *et seq.*; L. 2009, ch. 109, secs. 23-30, which altered the statutory standard of review under K.S.A. 77-621(c). The panels have divided on whether those amendments are retroactive. We hold they are not. Both K.S.A. 77-621(a)(2) and K.S.A. 2009 Supp. 77-621(a)(2) contain a savings clause limiting the revised standard of review in K.S.A. 2009 Supp. 77-621(c)(7) and (d) to agency decisions issued on or after July 1, 2009. Accordingly, because the agency finding in this case was made before the 2009 amendments became effective, we apply the standard of review under K.S.A. 77-621(c)(7) in effect when the agency issued its order that found Redd's multiple right upper extremity impairments developed as a natural consequence of the crush injury to his left hand.

Next, we decide the correct methodology to calculate awards when an employee suffers multiple scheduled injuries. A majority of the Board held Redd was entitled to five separate scheduled injury awardsone for each impairment to a scheduled member of his right and left upper extremities. Kansas Truck Center argues Redd's injuries should have been combined into a single whole

body impairment as contemplated by the American Medical Association Guides to Evaluation of Permanent Impairment (Guides) (4th ed. 1995). We hold the correct statutory interpretation requires assignment of separate awards for each scheduled member suffering disability or impairment that appears in the K.S.A. 44-510d schedule and affirm the method used in this case.

In reaching this conclusion, we decline to endorse a competing methodology also used by the Board in at least one other claim that combined multiple injuries to the same extremity to the highest level of injury on that extremity. Our disagreement with that approach is discussed below and in our decision in *Mitchell v. Petsmart, Inc.*, 291 Kan. 153, 239 P.3d 51 (2010).

Finally, we reject Kansas Truck Center's claim that the $50,000 compensation cap in K.S.A. 44-510f(a)(4) limits Redd's award. We hold the statutory cap does not apply when a worker is awarded both temporary total disability benefits and permanent partial disability benefits for multiple scheduled injuries under K.S.A. 44-510d.

## FACTUAL AND PROCEDURAL BACKGROUND

Redd was a gear technician and diesel truck mechanic for Kansas Truck Center. He began working for the company in June 1996. His job required him to rebuild transmissions and work on suspensions and clutch assemblies. His left thumb was crushed in 2003 while repairing a semi-tractor trailer suspension. Redd immediately reported the injury to his supervisor. The company referred him to several doctors, who all agreed Redd should be placed on light duty work restrictions.

Initially, Redd did not miss any work other than for doctor appointments. For 7 months after the accident, he performed the same job tasks despite his light duty restrictions because Kansas Truck Center did not provide any accommodations to comply with the doctors' limitations. During this period, Redd tried to avoid using his injured left hand and thumb area by finding different ways to perform his job. He testified he would balance heavy objects across the forearm of his left hand and use rope placed around his neck and tied with a noose to help carry heavy equipment parts.

If a coworker was around, Redd would ask for help, but most times he performed the tasks himself by working with his right hand.

Redd claimed he began experiencing problems with his right upper extremity about 1 month after the crush injury to his left thumb. He testified he told his supervisor, an insurance company adjuster, and one of his doctors that he had pain in his right hand. Kansas Truck Center disputes this testimony, noting the medical records only mention treatment for Redd's left extremity and do not reference right hand pain. Redd's doctor fitted him with a custom spica split. But when he returned to work after this treatment, he was told by Kansas Truck Center that it could not continue to allow him to work because of the restrictions his doctor had placed on him. Redd last performed work for Kansas Truck Center on December 11, 2003. He underwent surgery to his left thumb in April 2004. Redd was formally terminated in October 2004.

Dr. J. Mark Melhorn became Redd's treating physician in 2005. Dr. Melhorn performed surgeries on Redd's right wrist and elbow, left wrist and elbow, and left thumb. Dr. Melhorn testified the work Redd performed after the crush injury contributed to the conditions in his right upper extremity. Also in 2005, Dr. James L. Gluck examined Redd at Kansas Truck Center's request. This occurred before Dr. Melhorn performed any surgery. Dr. Gluck testified he did not "see a well-defined pathologic process that would explain [Redd's] symptomology." Dr. Gluck found the left thumb abnormality was related to the crush injury and adopted another doctor's impairment rating for that injury. But Dr. Gluck testified the symptoms in Redd's right upper extremity and left upper extremity were not work related. Redd filed a claim under the Workers Compensation Act, K.S.A. 44-501 *et seq.*

The administrative law judge (ALJ) appointed Dr. Paul Stein to perform an independent medical evaluation in the workers compensation proceedings. In his report, Dr. Stein concluded Redd's injury to his left thumb was the only left hand damage causally related to the crush injury, but he also found within a reasonable degree of medical probability that the crush injury could have caused carpal tunnel syndrome. Dr. Stein assigned 21 percent total

impairment to the left thumb. Following the Guides, Dr. Stein converted the 21 percent impairment to the thumb into a 9 percent impairment to the hand, an 8 percent impairment to the upper extremity, and a 5 percent impairment to the whole person. He then assigned a 10 percent impairment to the left upper extremity for carpal tunnel syndrome.

Moving to the next step required by the Guides, Dr. Stein combined the 8 percent upper extremity impairment caused by the thumb and the 10 percent upper extremity injury caused by carpal tunnel into a 17 percent total left upper extremity impairment. Dr. Stein did not provide a combined whole body impairment calculation for these injuries. Even though he could not causally relate them to the crush injury, Dr. Stein assigned a 5 percent impairment to the left upper extremity for an impaired range of motion in Redd's left wrist and a 3 percent right upper extremity impairment for lateral elbow pain if the ALJ disagreed with his causation findings.

Dr. Pedro Murati also examined Redd. Dr. Murati reported Redd complained of a grinding pain in his right thumb, numbness and tingling in the fingers, and a burning sensation in his right hand. Redd also told Dr. Murati his hands went numb when he was driving and his right shoulder felt out of alignment. Dr. Murati found these conditions were caused by overuse following the crush injury.

The ALJ entered an award for temporary total and permanent partial disability. Regarding the permanent partial disability, the ALJ determined Redd's testimony, taken in conjunction with the medical opinions, established that Redd sustained work-related injuries to both his right and left upper extremities. The ALJ found Redd was entitled to an award based on the statutorily scheduled injuries to his right and left upper extremities as provided in K.S.A. 44-510d. The ALJ assigned a 21 percent impairment to the left upper extremity and a 10 percent impairment to Redd's right upper extremity. The ALJ approved two scheduled injuries awards, one for each extremity. Redd requested review by the Board.

In that review, the Board entered its order finding Redd's right and left upper extremity conditions were a natural consequence

resulting from the crush injury to his left hand and Redd's subsequent overcompensation use for that injury. The Board awarded Redd permanent partial and temporary total disability benefits. Regarding the permanent partial disability, the Board determined Redd had five scheduled injuries to his left hand and right upper extremities, rather than the two the ALJ awarded. The Board assigned the following regional impairment ratings: (1) 16 percent impairment to claimant's left hand; (2) 10 percent for the left forearm (carpal tunnel syndrome); (3) 10 percent for the left arm (tunnel/ulnar nerve decompression); (4) 10 percent for the right forearm (carpal tunnel syndrome); (5) 15 percent for the right arm (right ulnar cubital tunnel decompression and lateral epicondylectomy).

But the Board members disagreed about how to calculate Redd's award. A majority determined the statutes required separate awards for each scheduled injury. One dissenting Board member argued the multiple injuries should have been combined, based upon that member's interpretation of K.S.A. 44-510d(a)(23), which provides "the loss of a scheduled member shall be based upon permanent impairment of function as determined using the [Guides], if the impairment is contained therein." The dissenter went on to predict: "This dispute will arise each time the Board is asked to consider extremity injuries when the claimant is not found to be permanently and totally disabled and when the claimant has more than one body part injured in one or more extremities."

Kansas Truck Center filed a timely appeal. Redd moved to transfer the case to this court, which was granted. Jurisdiction arises from K.S.A. 20-3018(c) (transfer from Court of Appeals).

Kansas Truck Center advances three issues before this court: (1) whether substantial competent evidence supported the Board's determination that the left hand crush injury caused Redd's right upper extremity impairments; (2) whether the Board erred by calculating permanent partial disability awards for each of Redd's five scheduled impairments, instead of making one award for a whole body impairment; and (3) whether the Board erred by not applying the $50,000 cap specified in K.S.A. 44-510f(a)(4) for Redd's tem-

porary total and permanent partial disability benefits award. We address each issue in order.

ISSUE ONE: SUBSTANTIAL COMPETENT EVIDENCE

Kansas Truck Center first challenges the Board's factual findings that the injury to Redd's right upper extremity was a natural consequence of the crush injury to his left thumb and Redd's over-compensation use for that injury while he continued working for the company. Redd defends these determinations. The Board's findings that Redd's left upper extremity injuries were related to the left hand crush injury are not at issue.

*Standard of Review*

Our standard of review for cases under the Workers Compensation Act, K.S.A. 44-501 *et seq*., is statutorily controlled by the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq*. See K.S.A 44-556; K.S.A. 2009 Supp. 44-556. This Act was recently amended and renamed the Kansas Judicial Review Act (KJRA). L. 2009, ch. 109, secs. 23-30 (now codified at K.S.A. 2009 Supp. 77-601 *et seq*.). Review of an agency's factual findings is permitted under K.S.A. 77-621(c)(7) and K.S.A. 2009 Supp. 77-621(c)(7), depending on the effective date of the agency action. Whether substantial competent evidence exists is a question of law. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 514, 154 P.3d 494 (2007).

Effective July 1, 2009, the legislature revised the statutory standard of review of an agency's factual determination. See K.S.A. 2009 Supp. 77-621(c)(7) and (d). Several Court of Appeals panels have since disagreed as to whether the new standard should be applied retroactively or whether it only applies prospectively to agency decisions issued on or after July 1, 2009. As revised, K.S.A. 2009 Supp. 77-621(d) now alters an appellate court's analysis in three ways: (1) It requires review of the evidence both supporting and contradicting the Board's findings; (2) it requires an examination of the presiding officer's credibility determination, if any; and (3) it requires review of the agency's explanation as to why the evidence supports its findings. The revised statute now states:

"(d) For purposes of this section, 'in light of the record as a whole' means that the adequacy of the evidence in the record before the court to support a particular finding of fact *shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact.* In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review." (Emphasis added.) K.S.A. 2009 Supp. 77-621(d).

When confronted with this revised statute, some Court of Appeals panels have held the statutory changes were procedural in nature and, therefore, should be applied retroactively. See, *e.g.,* *Douglas v. Ad Astra Information Systems,* 42 Kan. App. 2d 441, 450-51, 213 P.3d 764 (2009), *rev. granted* June 23, 2010. But as pointed out recently by another Court of Appeals panel, those decisions ignore the savings clause contained in the legislation, K.S.A. 77-621(a)(2), now codified at K.S.A. 2009 Supp. 77-621(a)(2). *Milano's Inc. v. Kansas Dept. of Labor,* 43 Kan. App. 2d. 779, 786-87, 231 P.3d 1072 (2010). Both K.S.A. 77-621(a)(2) and K.S.A. 2009 Supp. 77-621(a)(2) state: "[T]he validity of agency action shall be determined in accordance with the standards of judicial review provided in this section, *as applied to the agency action at the time it was taken.*" (Emphasis added.)

This court previously has held "all rights of action will be enforced under [procedural amendments] without regard to whether they accrued before or after such change of law and without regard to whether or not the suit has been instituted, *unless there is a savings clause as to existing legislation.*" (Emphasis added.) *Jones v. Garrett,* 192 Kan. 109, 114-15, 386 P.2d 194 (1963). Therefore, the savings clause in K.S.A. 77-621(a)(2) provides that the KJRA provisions in effect at the time of the agency action are controlling.

At the time at issue in this appeal, K.S.A. 77-621(c)(7) required review of the agency's determination for evidence "that is substantial when viewed in light of the record as a whole." Caselaw defined substantial evidence as evidence possessing something of substance and relevant consequence to induce the conclusion that the award

was proper, furnishing a basis of fact from which the issue raised could be reasonably resolved. *Graham v. Dokter Trucking Group*, 284 Kan. 547, 553-54, 161 P.3d 695 (2007). Under this holding, the Board's preamendment decision should be upheld if supported by substantial evidence, even though there is other evidence in the record supporting contrary findings. 284 Kan. at 554.

*The decision is supported by substantial competent evidence*

The ALJ and the Board both determined that overcompensation use from the crush injury to Redd's left hand caused Redd's right upper extremity injuries. The ALJ, the Board, and the parties do not articulate this point, but the secondary injury rule authorizes the award for the right upper extremity injuries under these facts. The rule provides "when a primary injury under the Work[ers] Compensation Act is shown to have arisen out of and in the course of employment every natural consequence that flows from the injury, including new and distinct injury, is compensable *if it is a direct and natural result of the primary injury.*" (Emphasis added.) *Jackson v. Stevens Well Service*, 208 Kan. 637, 643, 493 P.2d 264 (1972). This is what Redd claims. Whether a secondary injury is compensable as a natural and probable consequence of the primary injury depends upon the facts.

In agreeing with Redd, the ALJ relied upon the medical testimony of Drs. Melhorn, Gluck, Murati, and Stein to conclude the injury to Redd's right upper extremity was caused by its overcompensation use after the left-hand thumb crush injury. In rejecting Kansas Truck Center's argument that the award should be limited to Redd's left hand and thumb, the ALJ found Redd underwent surgery to his right upper extremity in connection with treatment for the crush injury. Dr. Melhorn conducted these surgeries, and he testified the insurer approved of, and paid for, all of the procedures.

The Board agreed with the ALJ on this point. In finding causation existed for the injuries to both the left and right upper extremities, the Board cited Redd's testimony that he returned to full duty work despite his light duty restrictions, but to do so he had to compensate for his injured left hand. The Board found this led

to symptoms in his right hand and right arm within 3 to 4 weeks. The Board also found support in Dr. Melhorn's opinion for its conclusion that Redd's subsequent work activities contributed to the right upper extremity injuries, which required surgery.

But Kansas Truck Center urges that the Board's causation finding regarding the injuries to the upper right extremity should be reversed because Redd's testimony was not credible, the doctor's testimony was insufficient, and the weight of the medical testimony did not support a causation finding that the left hand crush injury caused problems with the right upper extremities. All three arguments fail under our standard of review.

First, Kansas Truck Center attacks the credibility of Redd's testimony supporting causation because, the employer argues, Redd did not report the upper right extremity problem to his treating physicians while he was still employed by the company. This argument is without merit because it involves a credibility determination made by the Board. This court will not reassess credibility on appeal. *Frick Farm Properties v. Kansas Dept. of Agriculture*, 289 Kan. 690, 709-10, 216 P.3d 170 (2009).

Redd testified he told his supervisor, an insurance company adjuster, and his doctor, while still employed, that he was experiencing pain in his right hand. The ALJ found this testimony credible and relied upon it when determining Redd properly notified his employer regarding the injuries to both his left and right extremities. The Board's findings are consistent with this credibility determination. The Board held Redd notified his employer, the insurance carrier, and Redd's doctor that he was having problems with his right upper extremity. The ALJ personally observed Redd's demeanor and found his testimony credible. We will not disturb this determination.

Second, Kansas Truck Center argues Dr. Melhorn, the doctor the Board relied upon, did not specifically state there was causation or that it was within a reasonable degree of medical certainty. Kansas Truck Center also challenges Dr. Melhorn's causation finding as not credible, claiming the doctor testified Redd's complaints were unverifiable and noted Redd did not exhibit optimal effort during the grip tests.

But this misstates Dr. Melhorn's testimony and involves another credibility determination. Dr. Melhorn concluded Redd's work activities contributed to his right upper extremity injuries. Dr. Melhorn conducted surgery on Redd's upper right extremity while acting as the treating physician and assigned an impairment rating for the right arm. As to the veracity of Redd's complaints, Dr. Melhorn acknowledged he was unable to verify them through objective testing, but he further testified he believed the impairment rating was appropriate considering Redd's medical history, the physical exam, and a nerve conduction study. Dr. Melhorn also testified he did not have a reason to disbelieve Redd's complaints. Accordingly, the record supports the Board's reliance on Dr. Melhorn's testimony.

Third, Kansas Truck Center argues the Board's causation finding contradicts the weight of the medical testimony. Conceivably, this argument might have greater strength under the revised statutory standard of review under the KJRA discussed above, which requires examining the evidence both supporting and detracting from the agency's findings. K.S.A. 2009 Supp. 77-621(d). But the argument certainly fails under the standard of review applicable under K.S.A. 77-621(c)(7) for this appeal because it was reasonable for the Board to principally rely upon Redd's treating physician, whose testimony supported the Board's finding.

Both Drs. Melhorn and Murati found causation. Their conclusions were buttressed by Redd's testimony that symptoms in his right hand began 3 to 4 weeks after he began working while favoring it. Ultimately, this was another credibility determination. It was reasonable for the Board to accept the treating physician's testimony, which was supported by Dr. Murati. We will not disturb this finding. We hold the Board's causation decision was supported by substantial competent evidence in light of the record as whole.

## Issue Two: Permanent Partial Disability Award Calculation

Next, Kansas Truck Center challenges the Board's method for calculating the permanent partial disability award. Various positions are advanced as the correct outcome. The Board's majority held Redd was entitled to permanent partial disability compensa-

tion for five scheduled injuries. It issued separate awards for each of the five impairments, resulting in the following awards: (1) left hand totaled $9,650.88 for a 16 percent loss of use; (2) left forearm totaled $8,190.72 for a 10 percent loss of use; (3) left arm totaled $8,622.72 for a 10 percent loss of use; (4) right forearm totaled $8,190.72 for a 10 percent loss of use; and (5) right arm totaled $12,934.08 for a 15 percent loss of use. This resulted in a total permanent partial disability award of $47,589.12.

Kansas Truck Center counters that the Board should have combined these five impairments into one whole body impairment rating, resulting in one award. It argues this calculation method is required by K.S.A. 44-510d(a)(23), which adopts the Guides. In its brief, Kansas Truck Center argues "[t]he Guides' method was appropriately used by the physician experts in this case, converting [Redd's] regional impairments to a whole body impairment using the Combined Values Chart." ·

This is similar to the position taken in the Board's dissenting opinion, which argued the Board should "determine the upper extremity impairments for each separate part as done by the majority, but, then, combine the upper extremity impairments as instructed by the [Guides]." The dissenting board member did not clarify whether he believed the Guides required calculating these injuries as a whole body impairment, as Kansas Truck Center argued, or combined as separate upper extremity impairments, as done by the *Mitchell* panel.

*Standard of Review*

Under the KJRA, this court may grant relief if the Board has erroneously interpreted or applied the law. K.S.A. 77-621(c)(4). Statutory interpretation is subject to unlimited appellate review. *Higgins v. Abilene Machine, Inc.*, 288 Kan. 359, 361, 204 P.3d 1156 (2009). Redd argues this court should be deferential to the Board's interpretation of the Workers Compensation Act when there is a rationale basis for its interpretation, citing *Casco*, 283 Kan. at 521.

But this argument ignores this court's more recent decisions, which have recognized little utility for such deference given the long-standing admonition that appellate courts are always free to

substitute their judgment for that of the administrative agency when reviewing a question of law. *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 457, 228 P.3d 403 (2010) ("In this matter, an appellate court exercises unlimited review on the determinative question of statutory interpretation without deference to [the agency's] view as to its own authority."); *Higgins*, 288 Kan. at 361 ("No significant deference is due [an administrative law judge's] or the [Workers Compensation] Board's interpretation or construction of a statute."). Indeed, when an agency applies the same statute in conflicting ways, as the Board has on this question, any judicial deference is stymied. *Cf. Burlington N.&S.F.R. Co. v. White*, 548 U.S. 53, 65-66, 165 L. Ed. 2d 345 , 126 S. Ct. 2405 (2006) (Agency views that are shifting or insufficiently developed have little or no persuasive value.).

Furthermore, when appellate courts embark upon statutory interpretation and construction, "the most fundamental rule . . . is that the legislature's intent governs if [it] can be ascertained." *Higgins*, 288 Kan. at 361. The first step is to ascertain legislative intent through the language employed, giving ordinary words their ordinary meaning. 288 Kan. at 361-62. When a statute is plain and unambiguous, this court must give effect to the statute's express language, instead of determining what the law should or should not be. Appellate courts will not speculate about legislative intent or read a statute in a manner that adds something not readily contained within it. 288 Kan. at 362 (quoting *Graham*, 284 Kan. at 554.)

*The statutes require separate awards*

As noted above, the Board has employed, and the Court of Appeals has affirmed, different methods for calculating permanent partial disability awards. The Board uses one here, assigning separate awards for each injury to a scheduled member. A Court of Appeals panel recently affirmed this method in *Conrow v. Globe Engineering Co.*, No. 99,718, unpublished opinion filed March 13, 2009. Another method the Board utilized combined multiple injuries to the same extremity to the highest level of injury on that extremity. A different Court of Appeals panel approved this ap-

proach in *Mitchell v. Petsmart, Inc.*, 41 Kan. App. 2d 523, 203 P.3d 76 (2009), *rev. granted* 289 Kan. 1279 (2009). We announce a decision in that case this same day and reverse the *Mitchell* panel's decision on this point. *Mitchell*, 291 Kan. 153, 239 P.3d 51 (2010). In Redd's case, the *Mitchell* court's approach would result in two permanent partial disability awardsone for Redd's left upper extremity and one for Redd's right upper extremity.

But neither of these two conflicting methodologies used by the Board involves a whole body impairment calculation, which is a third approach and the one advocated by Kansas Truck Center in this appeal. Accordingly, we must determine which method is correct under K.S.A. 44-510d in this case. A review of the governing statutes, the case law interpreting those statutes, the Guides, and the legislative history for K.S.A. 44-510d(a)(23) is required. We will follow those reviews with an analysis to resolve the question.

*A. The Statutes*

An overview of the Workers Compensation Act places the issue in context. In *Casco v. Armour-Swift Eckrich*, 283 Kan. 508, 522, 154 P.3d 494 (2007), this court explained:

"The Workers Compensation Act calculates compensation differently depending on the nature of the disability. K.S.A. 44-510c provides compensation for temporary and permanent total disabilities. K.S.A. 44-510d and 44-510e provide compensation for permanent partial disabilities. K.S.A. 44-510d calculates the award based on a schedule of disabilities. If an injury is on the schedule, the amount of compensation in the schedule includes compensation for the complete loss of the member or the partial loss of the member. K.S.A. 44-510d(a) (21). The compensation for a scheduled disability is based on the schedule alone without regard to the claimant's loss in earning power. [Citation omitted.] K.S.A. 44-510e, on the other hand, calculates the award for any injury not included on the schedule."

Kansas Truck Center's challenge solely pertains to the permanent partial disability calculation. Both K.S.A. 44-510d and K.S.A. 44-510e are relevant. The Board's scheduled injury calculation was made under K.S.A. 44-510d, but Kansas Truck Center's approach would require compensation as if Redd suffered a general disability under K.S.A. 44-510e because whole body impairments are not scheduled injuries.

K.S.A. 44-510d(a) provides in part that permanent partial disability compensation "is to be paid for not to exceed the number of weeks allowed" in the following schedule:

"(11) For the loss of a hand, 150 weeks.

"(12) For the loss of a forearm, 200 weeks.

"(13) For the loss of an arm, excluding the shoulder joint, shoulder girdle, shoulder girdle, shoulder musculature or any other shoulder structures, 225 weeks.

. . . .

"(21) . . . For the permanent partial loss of use of a . . . hand . . . arm . . . shall be paid as provided for in K.S.A. 44-510c . . . per week during that proportion of the number of weeks in the foregoing schedule provided for the loss of such . . . hand, [arm, or shoulder], which partial loss thereof bears to the total loss of a . . . hand, [arm, or shoulder] . . . ; but in no event shall the compensation payable hereunder for such partial loss exceed the compensation payable under the schedule for the total loss of such . . . hand, arm, [or shoulder] . . ., exclusive of the healing period.

. . . .

"(23) Loss of a scheduled member shall be based upon the permanent impairment of function to the scheduled member as determined using the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, if the impairment is contained therein."

K.S.A. 44-510e defines permanent partial general disability as a disability, partial in character and permanent in quality, which the K.S.A. 44-510d schedule does not cover. It then establishes a unique method for calculating general disabilities that considers wage loss. That particular methodology is not relevant to this appeal, but it should be noted that general disabilities tend to result in higher awards. *Pruter v. Larned State Hospital*, 271 Kan. 865, 869, 26 P.3d 666 (2001). Kansas Truck Center predicates much of its advocacy for a whole body impairment on the language in K.S.A. 44-510(d)(a)(23), which requires loss of a scheduled member be based upon the permanent impairment of function to the scheduled member "as determined" using the Guides. Accordingly, it is appropriate to next consider those Guides in the applicable context for this case.

## B. *The Guides*

This court has not examined the Guides or the meaning of their adoption in K.S.A. 44-510d(a)(23). According to the foreword, the Guides' stated purpose is " 'to bring greater objectivity to estimating the degree of long-standing or "permanent" impairments.' " Guides, p. v. This is accomplished by performing medical evaluations "in accordance with the directions in the Guides." Guides § 1.2, p. 3.

The first step under the Guides is assessment or evaluation. This requires a documented medical evaluation and review of a patient's case history. The Guides contain chapters on each organ system, and each chapter contains descriptions on ways to evaluate the body part, function, or system. Guides § 1.2, p. 3. The Guides' methods for evaluating impairments to the upper extremities are outlined in Chapter 3, relating to the musculoskeletal system. The hand and upper extremity sections cover the thumb, finger, wrist, elbow, and shoulder regions. Guides §§ 3.1a-3.1o, pp. 15-74.

The second step requires combining impairments. The Guides instruct physicians to combine impairments to the same member and then convert that impairment to the next larger unit. For example, multiple injuries to the same thumb are combined. Then, the total thumb impairment is converted to a hand or "regional" impairment. All regional impairments, *i.e.*, hand, wrist, and shoulder, are combined to generate a total impairment to the upper extremity. Ultimately, this upper extremity calculation is converted into a whole body impairment. Guides §§ 3.1e, 3.1n, pp. 24, 65. These calculations are performed whether it is a single injury, *i.e.*, impairment to one hand, or multiple injuries, *i.e.*, impairment to the hand and shoulder. Guides § 3.1o, pp. 66-74.

Guides § 3.1e, p. 24, entitled "Combining Impairment Values," demonstrates how to combine impairments for the same member, *i.e.*, one finger with two impairments, and how to combine multiple regional impairments, *i.e.*, the hand, wrist, and shoulder. It states:

"When there is more than one impairment of a member, such as abnormal motion, sensory loss, and amputation of a finger, the impairments must be *combined* before the conversion to the next larger unit, in this case the hand, is made.

"The method for combining impairments is based on the idea that a second or a succeeding impairment should apply not to the whole, but only to the part that remains after the first and other impairments have been applied. . . .

"The Combined Values Chart on p. 322 may be used to determine the combined value of two impairment percents or, in succession, any number of impairment percents.

. . . .

"Multiple regional impairments, as with those of the hand, wrist, elbow, and shoulder, are expressed in terms of impairment of the upper extremity and are *combined* using the Combined Values Chart. The Chart is used also to combine impairments of two or more organ systems and express these as a whole-person impairment."

Guides § 3.1n, p. 65, entitled "Combining Regional Impairments to Obtain Impairment of the Whole Person," instructs a physician to combine regional impairments, *i.e.*, hand, wrist, or shoulder, into a whole body impairment. The first step is to covert these impairments into a value for the upper extremity. Then, the Guides § 3.1n, p. 65, converts the upper extremity impairment into a whole body impairment, stating:

"1. Determine the impairments of each region (hand, wrist, elbow, and shoulder joints) as described in preceding sections.
"2. Use the Combined Values Chart (p. 322) to *combine* impairments to the upper extremity contributed by each region.
. . . .
"3. Use Table 3 (p.20) to convert impairment of the upper extremity to impairment of the whole person."

Guides § 3.1o, pp. 66-74, entitled "Summary of Steps for Evaluating Impairments of the Upper Extremity," provides instructions for calculating upper extremity awards and combining them into whole body impairments. This summary instructs physicians to convert a singular injury into a regional impairment and then a whole body impairment, even if there are no other injuries. This is demonstrated by the Guides § 3.1o (I. Hand Region), p. 66, pertaining to calculating a hand impairment, which states:

"G. Total hand impairment: *add* the hand impairment values related to the involved digits.
"H. Convert hand impairment to upper extremity impairment. (Table 2, p.19)
. . . .

"K. If no other upper extremity impairment exists, convert the upper extremity impairment related to the hand region to a whole-person impairment (Table 3, p. 20)."

These instructions also are included at the bottom of Figure 1, which is titled "Upper Extremity Impairment Evaluation Record." Guides § 3.1a, p. 16.

As is easily seen from the above description, Kansas Truck Center is correct that the Guides contemplate converting a worker's injury into a whole body impairment. But that does not resolve the inquiry. We next consider Kansas Truck Center's claim in light of the consideration given to the Guides by the legislature when it included reference to them in the statutes.

### C. Applicable Legislative History

In evaluating Kansas Truck Center's argument, it is necessary to look more closely at K.S.A. 44-510d(a)(23), which references the Guides. This provision was added to the statute in 1993 and modified in 1996. L. 1993, ch. 286, sec. 33; L. 1996, ch. 79, sec. 23. But the only meaningful change in 1996 was adopting the fourth edition of the Guides instead of the third edition. L. 1996, ch. 79, sec. 23.

The 1993 amendment was part of a massive workers compensation revision effort. This court described the endeavor when it reviewed the changes:

"At the start of the 1993 legislative session, legislators had before them the reports of the Governor's Task Force on Workers Compensation, the Insurance Commissioner's Workers Compensation Task Force, and the Legislative Post Audit Committee, all of which suggested areas of the workers compensation system that the various committees determined needed reform. Over the course of the session, the House Committee on Labor and Industry and the Senate Committee on Commerce conducted hearings and heard from witnesses representing employees, employers, trial lawyers, labor organizations, and business associations. S.B. 307, which dealt with safety issues, was used as the vehicle for workers compensation reform. The legislation passed unanimously in both the House and Senate, and Governor Finney signed the bill into law." *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 842, 942 P.2d 591 (1997).

Dr. Phillip L. Baker's testimony before a legislative committee provides some insight for our present purposes into issues the leg-

islature considered regarding the Guides. Dr. Baker was asked to give his opinion on "whether physicians could rate and schedule shoulder or girdle problems at that area, *as provided in Sec. 23 of SB 215,* rather than body of the whole." (Emphasis added.) Minutes, Sen. Comm. on Commerce, February 10, 1993. Dr. Baker gave this response:

" '[T]he answer is yes, because that is the way we do it anyway. The only reason they are converted to whole body is because the system asks us to do that, and it has been that way as long as I can remember. In fact, it was hard to learn to do that. . . .' There is now a table in the AMA guidelines for impairment that [converts to a whole body impairment]. You just look up the percent that you have given to the upper extremity for the shoulder and go down the table until you find that number and there is a schedule that does that. . . . But it's not a medical issue, it's a book logistic issue that has little relationship to the body and how it functions and what this person may be doing." Minutes, Sen. Comm. on Commerce, February 10, 1993.

The committee's question at least impliedly suggests it did not mean for this provision to adopt the Guides' requirements to convert all injuries into whole body impairments. The doctor's answer also shows there is not a medical reason for combining the impairments, which means that refusing to adopt Kansas Truck Center's argument does not affect the impairment ratings' accuracy.

### D. Analysis

As noted above, even though Kansas Truck Center is correct that the Guides require combining impairments into whole body injuries, it still fails to address whether adopting this approach is consistent with the other provisions in the Workers Compensation Act. As Kansas Truck Center conceded at oral argument, if the Guides are followed literally, all impairments would be calculated as whole body injuries and compensated under K.S.A. 44-510e. This interpretation would render the scheduled injury provisions in K.S.A. 44-510d(a)(1)-(22) meaningless because a claimant would never be awarded benefits based on a scheduled injury.

This court previously addressed whether certain scheduled injuries can be converted into a whole body impairment given the scheduled injury provisions set out in the law. In *Casco,* the injured worker suffered a repetitive use injury to his left shoulder and

subsequently injured his right shoulder as a natural consequence of the first injury. The issue on appeal was whether injuries to parallel limbs should be calculated separately as scheduled injuries or combined and calculated as a general body disability under K.S.A. 44-510e.

The *Casco* court emphasized scheduled injuries were the general rule and general disabilities the exception, holding the awards at issue must be calculated as scheduled injuries in accordance with K.S.A. 44-510d. 283 Kan. at 528. In doing so, this court overruled *Honn v. Elliott*, 132 Kan. 454, 295 Pac. 719 (1931), which had allowed multiple scheduled injuries to be combined into whole body impairments. 283 Kan. at 527 (citing and discussing *Pruter*, 271 Kan. at 873-76). Admittedly, *Casco* did not address the K.S.A. 44-510d(a)(23) reference to the Guides, but Kansas Truck Center's argument that Redd's award should be converted into a whole body impairment would require us to overrule *Casco*.

To avoid this problem, Kansas Truck Center attempts to distinguish *Casco* by arguing its holding only applies to bilateral injuries, not separate injuries to the same extremity as Redd suffered. But this ignores the *Casco* decision's core, which definitively held that scheduled injuries are the general rule and that the statutory structure comprising the Workers Compensation Act does not permit combining scheduled injuries into a whole body impairment. 283 Kan. at 528-29.

In addition, if the plain reading of a statute yields an ambiguity or a lack of clarity, the rules of statutory construction are used to resolve the ambiguity. This requires moving outside the text of the provision and examining evidence of legislative intent, legislative history, or employing the additional canons of statutory construction to determine the legislature's meaning. *Higgins*, 288 Kan. at 362. The legislative history, as discussed above, is consistent with *Casco*'s aversion to whole body impairment when there is a specific statutory schedule.

Appellate courts also must consider various provisions of an act *in pari materia* to reconcile and bring the provisions into workable harmony if possible. *State v. Breedlove*, 285 Kan. 1006, 1015, 179 P.3d 115 (2008). If they cannot be resolved, a fundamental rule of

statutory construction is "[w]hen there is a conflict between a statute dealing generally with a subject and another statute dealing specifically with a certain phase of it, the specific statute controls unless it appears that the legislature intended to make the general act controlling." *Matjasich v. Kansas Dept. of Human Resources*, 271 Kan. 246, 251, 21 P.3d 985 (2001).

Applying the rules of statutory interpretation, the provision referencing the Guides in K.S.A. 44-510d(a)(23) must be read in a way that does not render the statutory schedule in K.S.A. 44-510d extraneous, if possible. See *State v. Trautloff*, 289 Kan. 793, 797, 217 P.3d 15 (2009) ("As a general rule, courts should read statutes to avoid unreasonable results and should presume that the legislature does not intend to enact useless or meaningless legislation."). But if the entire instructions contained in the Guides are to be applied to create a whole body impairment for every injury to a worker, as Kansas Truck Center argues they should be, the statute's scheduled injury sections in K.S.A. 44-510d(a)(1)-(22) become meaningless. Statutory construction rules do not favor this result.

As discussed above, the Guides were designed to increase objectivity and uniformity when estimating impairments. Dr. Baker's comments suggest the Guides' conversions into regional and whole body impairments were added simply to help physicians comply with their particular state's workers compensation requirements when applicable. But since the Kansas Legislature created its own mechanism to calculate permanent partial disability awards in K.S.A. 44-510d and K.S.A. 44-510e, the more reasonable interpretation for K.S.A. 44-510d(a)(23) is that the legislature meant to adopt the evaluation requirements but not the instructions to combine and convert the injuries into whole body impairments. This view maintains the Guides' purpose of bringing greater objectivity to the physician's task of estimating the magnitude of permanent impairments, while allowing for the scheduled injury calculations specified in the statute.

This interpretation also is consistent with another statutory interpretation rule that the more specific statute should govern if the statutes cannot be reconciled. *In re Roth*, 269 Kan. 399, 403, 7 P.3d 241 (2000) ("[W]here a conflict between general and specific

statutes exists, the specific statute will prevail unless it appears that the legislature meant to make the general statute controlling."). The scheduled injury provisions in K.S.A. 44-510d(a)(1)-(22) deal specifically with how a permanent partial disability award should be calculated, while the Guides are a general instruction manual developed to help physicians across the nation calculate impairments for claimants without specific reference to a particular state's statutory scheme for providing benefits to injured workers. K.S.A. 44-510d(a)(23) is the more general provision in the statute. We conclude the Guides should not control over the more specific statutory schedule. We hold this statutory analysis and our rationale in *Casco* demonstrate Redd's impairments should not be combined into whole body impairments.

But this conclusion does not end our inquiry. As discussed above, the Board used a different method of calculation in *Mitchell*. This variation in *Mitchell* stopped short of combining multiple injuries to single extremities into a whole body impairment. We must determine whether that alternative method is proper before ruling how Redd's award should be calculated.

The employee in *Mitchell* also suffered multiple injuries like Redd. The Board determined Mitchell suffered repetitive trauma, developing bilateral carpal tunnel syndrome, right elbow symptoms, and bilateral shoulder injuries. The Board then combined these impairment ratings at the level of each shoulder, resulting in a 24.5 percent impairment to the right upper extremity and a 8 percent impairment to the left upper extremity. Two board members dissented, arguing Mitchell's injuries needed to be compensated on the schedule at the level corresponding to that injury. The dissenters argued for separate calculations, which was the approach the Board majority used for Redd.

The *Mitchell* panel interpreted K.S.A. 44-510d to allow compensation at the highest level of the injury when multiple injuries occur within a single extremity. First, it distinguished its calculations from those found improper in *Casco* by noting the Board did not convert Mitchell's injuries into a whole body impairment thereby requiring compensation under the general disability statute, K.S.A. 44-510e. Then, it noted the statutory structure of the

scheduled injuries was progressive, meaning an injured worker is entitled to more weeks if the injury occurs at a higher level, *i.e.,* 200 weeks for a forearm, but 210 weeks for the loss of an arm. The panel quoted *Casco,* 283 Kan. at 522, stating that " '[i]f an injury is on the schedule, the amount of compensation in the schedule includes compensation for the complete loss of the member or the partial loss of the member.' " But the panel then stated that where only a partial loss occurs, the number of weeks is reduced by the percentage of the loss and, thus, "the principle of compensating an extremity at the highest level affected applies regardless of whether the loss is total or partial." *Mitchell,* 41 Kan. App. 2d at 537.

Admittedly, this approach does not render the statutory schedule meaningless, but it does read something into the provisions of K.S.A. 44-510d(a)(1)-(22) that does not exist. The schedule does not contain any language requiring the combination of scheduled injuries, and the *Mitchell* panel did not explain where it found the authority to justify the way in which the Board combined Mitchell's injuries.

Using the statutory construction analysis recited above, we hold the best way to reconcile K.S.A. 44-510d(a)(23) with the statutory schedule is to use the Guides as a mechanism to evaluate impairment at the level of the injury and not to apply its provisions that call for combining injuries first into regional, and then whole body, impairments. As such, separate awards should be provided at each injury level. The Board majority correctly calculated Redd's award.

### ISSUE THREE: THE $50,000 CAP IN K.S.A. 44-510f(a)(4)

Finally, Kansas Truck Center argues the $50,000 benefit cap in K.S.A. 44-510f(a)(4) applies because Redd's permanent partial disability award was for "functional impairment only." Redd received $47,589.12 for permanent partial disability and $22,464 for temporary total disability. This resulted in a total award of $70,053.12. For the $50,000 cap to apply under these facts, Kansas Truck Center argues the statute limits Redd's total disability award. Redd, of course, argues the $50,000 cap does not apply in cases where temporary total disability benefits are awarded, citing *Roberts v. Mid-*

*west Mineral Inc.*, 41 Kan. App. 2d 603, 204 P.3d 1177 (2009), *pet. for rev.* filed April 20, 2009 (pending). Applying the cap as Kansas Truck Center advocates would decrease Redd's award by $20,053.12.

Kansas Truck Center's argument also presents a question of statutory interpretation subject to unlimited appellate review as did the last issue. And, as noted above, we cannot give deference to the Board's interpretation on this question because the Board has applied the statute in contradictory ways. See *Smothers v. Transervice Logistics, Inc.*, 2009 WL 1588632, at *4 (Work. Comp. Bd., No. 1,039,301, filed May 29, 2009) (declining to follow *Roberts* after the *Roberts'* petition for review was filed); *Martinez v. Cargill Meat Solutions*, 2010 WL 2671463, at *6 (Work. Comp. Bd., No. 1,027,952, filed June 25, 2010) (adopting the *Roberts* approach).

The meaning of K.S.A. 44-510f(a)(4) is an issue of first impression for this court, but two Court of Appeals panels have addressed it. *Roberts,* 41 Kan. App. 2d at 603, and *Rinke v. Bank of America,* No. 93,868, unpublished opinion filed March 30, 2007. The panels interpreted the statutory language differently, although both decisions resulted in findings that did not apply the $50,000 statutory cap.

First, we review the statute in controversy.

K.S.A. 44-510f(a) sets an employee's maximum compensation benefits. It states:

"(a) Notwithstanding any provision of the workers compensation act to the contrary, the maximum compensation benefits payable by an employer shall not exceed the following:

"(1) For permanent total disability, including temporary total, temporary partial, permanent partial and temporary partial disability payments paid or due, $125,000 for an injury or any aggravation thereof;

"(2) for temporary total disability, including any prior permanent total, permanent partial or temporary partial disability payments paid or due, $100,000 for an injury or any aggravation thereof;

"(3) subject to the provisions of subsection (a)(4), for permanent or temporary partial disability, including any prior temporary total, permanent total, temporary partial, or permanent partial disability payments paid or due, $100,000 for an injury or any aggravation thereof; and

"(4) *for permanent partial disability, where functional impairment only is awarded, $50,000 for an injury or aggravation thereof.*" (Emphasis added.)

Functional impairment is considered only in instances in which an injured worker suffers from a partial loss of use of a member, in which case there must be a determination of the percentage of loss of use of the scheduled member. The permanent partial general disability statute defines functional impairment as

"the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence and based on the fourth edition of the American Medical Association Guides to the Evaluation of Permanent Impairment, if the impairment is contained therein." K.S.A. 44-510e(a).

In 1993, K.S.A. 44-510f was amended to add subsection (a)(4) as part of workers compensation reform . L. 1993, ch. 286, sec. 35. Additional language was also added to K.S.A. 44-510f(a)(3) that year. Specifically, that the $100,000 cap was "subject to the provisions of subsection (a)(4)". L. 1993, ch. 286, sec. 35.

A representative from the Revisor of Statutes testified the workers compensation bill " '[p]rovides a cap on "white collar" recoveries where there has been no wage loss at one-half the current limit for permanent partial disability.' " Minutes, Sen. Comm. on Commerce, February 8, 1993. These minutes do not specifically identify K.S.A. 44-510f(a)(4). But it is reasonable to assume they refer to this provision because it was the only statutory cap included in the 1993 amendments, and it allows one-half of the maximum compensation benefits allotted in K.S.A. 44-510f(a)(2)-(3). See L. 1993, ch. 286, sec. 35.

In *Rinke*, the claimant was awarded $32,364.71 in temporary total disability and $22,411.89 in permanent partial disability. The total for both awards was $54,776.60. The appellants argued K.S.A. 44-510f(a)(4) limited recovery in cases with "functional impairment only" to $50,000 and that this cap applied to the permanent partial and the temporary total disability awards. The Board held the language in K.S.A. 44-510f(a)(4) was clear and unambiguous and the $50,000 limit only applied to permanent partial disability awards. It also held the temporary total disability compensation was not included in this $50,000 cap. The *Rinke* panel affirmed, holding:

"As the Board noted, the $50,000 limit in K.S.A. 44-510f(a)(4) does not specify that it includes 'prior' TTD, PTD, TPD, or PPD as do other subsections of the statute. The statute requires only that the $50,000 cap be applied in permanent partial disability cases where functional impairment only is awarded. Here, Rinke was awarded permanent partial and temporary total disability. Considering the unambiguous language of K.S.A. 44-510f(a)(4), the Board's interpretation was not erroneous." Slip op. at 8.

In *Roberts,* the claimant also was awarded temporary total disability and permanent partial disability. The specific awards were not included in the opinion, but it is clear the total awards exceeded $50,000. The ALJ and Board limited claimant's total award to $50,000 under K.S.A. 44-510f(a)(4). The panel reversed, finding the $100,000 cap in K.S.A. 44-510f(a)(3) applied. 41 Kan. App. 2d at 611. In doing so, the panel must have found the statutes providing for caps were ambiguous.

The *Roberts* panel began by recognizing that appellate courts are required to consider provisions of an act *in pari materia* with the intent to reconcile and harmonize the provisions. It then determined K.S.A. 44-510f(a)(4) applies to both scheduled and non-scheduled permanent partial disabilities. 41 Kan. App. 2d at 611. Stated another way, it recognized there are two categories of permanent partial disability awards, scheduled and general disability, and both categories are based upon functional impairment. Therefore, the clause "for functional impairment only" was not meant to distinguish types of permanent partial disability awards.

The *Roberts* panel next attempted to reconcile K.S.A. 44-510f(a)(4) with K.S.A. 44-510f(a)(3), which places a $100,000 cap on "permanent or temporary partial disability, including any prior temporary total, permanent total, temporary partial, or permanent partial disability payments paid or due." The court asked: "If the $50,000 compensation cap in K.S.A. 44-510f(a)(4) applies to both scheduled and nonscheduled injuries, then what type of claims are subject to the $100,000 cap in K.S.A. 44-510f(a)(3)?" 41 Kan. App. 2d at 610-11.

The *Roberts* panel concluded the distinction between these statutes' application was whether the claimant received any other award. It stated:

"[T]he only reasonable interpretation of the statute is that K.S.A. 44-510f(a)(4) is limited to those few cases in which a claimant does not suffer an injury that causes the claimant to lose at least a week's time from work, but rather causes a 'functional impairment only.' *If there is an injury which prevents the claimant from working for at least a week, then the claimant is also entitled to TTD payments under K.S.A. 44-510c(b)(1), in which case the $100,000 compensation cap in K.S.A. 44-510f(a)(3) applies.*" (Emphasis added.) 41 Kan. App. 2d at 611.

In other words, the *Roberts* panel determined the term "functional impairment only" means K.S.A. 44-510f(a)(4) is effective when the only award is for permanent partial disability. If the employee also receives a temporary total disability award, the panel concluded, the $50,000 limitation does not apply. 41 Kan. App. 2d at 611.

We find this interpretation consistent with the rules of statutory construction and the limited evidence of legislative history. It also makes clear where the *Rinke* court over simplified its analysis. When viewing K.S.A. 44-510f(a)(4) in isolation, it is not unreasonable to interpret the phrase "functional impairment only" as meaning that the legislature intended to impose a separate cap on permanent partial disability awards. But this interpretation cannot be reconciled with the other sections of K.S.A. 44-510f, which also apply to permanent partial disability awards. The best interpretation is to construe "functional impairment only" to mean the injured worker received only a permanent partial disability and nothing else. Since Redd was awarded permanent partial disability and temporary total disability, Redd's award is subject to the $100,000 cap in K.S.A. 44-510f(a)(3), not the $50,000 limitation in K.S.A. 44-510f(a)(4).

CONCLUSION

We hold substantial competent evidence supported the Board's factual determinations that Redd's right upper extremities injuries resulted from the left hand crush injury.

We further hold the Board majority's separate injury calculation for each extremity was correct. Kansas Truck Center's argument that the scheduled injuries should have been combined into a whole body impairment is rejected as being inconsistent with the Workers Compensation Act. We also reject the calculation meth-

odology approved by the Court of Appeals panel in *Mitchell*, as discussed above and in our decision released this same date in that case.

Finally, we reject Kansas Truck Center's argument that Redd's award was subject to the $50,000 liability cap set out in K.S.A. 44-510f(a)(4); rather, it was subject to the $100,000 cap in K.S.A. 44-510f(a)(3).

Affirmed.