(257 P.3d 1277)
No. 104,732

PATRICIA GUSTIN, *Appellee*, v. PAYLESS SHOESOURCE, INC., and AMERICAN ZURICH INSURANCE CO., *Appellants*.

Opinion filed July 8, 2011.

*James C. Wright*, of Topeka, for appellants.

*George H. Pearson III*, of Topeka, for appellee.

Before MCANANY, P.J., LEBEN, J., and MERLIN G. WHEELER, District Judge, assigned.

MCANANY, J.: Patricia Gustin was employed by Payless Shoe-Source. For 10 years her job involved packing and decasing boxes of shoes. On the day of the accident she was sent to the receiving department to help unload a trailer. In the course of unloading the

trailer Gustin fell, resulting in injuries to her back and leg. She was paid temporary total disability benefits, after which she returned to light duty work. Two months after Gustin's fall, Payless closed its facility and Gustin was laid off. She has not worked since she left Payless.

Dick Santner, a vocational rehabilitation counselor, met with Gustin to prepare a list of tasks she had performed over the 15-year period preceding her accident. Santner determined that she was age 61 at the time of the accident. At Payless Gustin was categorized as a general warehouse employee. In the 15 years preceding the accident she worked for Payless for about 10 years and, before that, as a mailroom clerk for the State of Kansas. Santner identified seven job tasks related to Gustin's work at Payless. He identified six job tasks related to her prior employment as a mailroom clerk.

Six months after her fall, and at the request of her counsel, Gustin was examined by Dr. Edward Prostic. Dr. Prostic rated Gustin as having a 12% permanent impairment to the body as a whole. He opined that because of her fall, Gustin was no longer able to perform 7 of her previous 13 work tasks identified by Santner, resulting in a 53% task loss. He found that Gustin "is capable of returning to only light/medium-level employment with avoidance of frequent bending or twisting at the waist, forceful pushing or pulling, or more than minimal use of vibrating equipment, or captive positioning." He later testified that by "light/medium-level employment" he means no lifting over 35 pounds.

The seven tasks at Payless that Dr. Prostic found Gustin should not engage in include (1) unloading trailers with full cases of shoes and placing them on a conveyor, an activity that consumes an entire work day; (4) sealing boxes and pushing them down a conveyor, which is repeated one to two times per minute and requires occasional lifting of 20-50 pounds and frequent to constant reaching; (6) handling four to six boxes of shoes at a time which consumes a majority of the shift work and requires constant reaching, lifting, and standing; and (7) placing empty boxes on an overhead trolley, an activity that occurs approximately twice each minute and requires frequent overhead reaching and constant standing.

Dr. Prostic recommended that Gustin not perform those seven restricted tasks, though he did not strictly command her not to do so. He testified that as an examining physician he does not have the ability to order Gustin to refrain from an activity. "So this is more in terms of advice rather than a command." He noted that applying "the Vince Lombardi standard," Gustin had "the physical capacity to perform" the restricted tasks; it was simply a matter of "how much discomfort she's willing to tolerate."

When Dr. Prostic examined Gustin, he concluded that she could not do constant standing or occasional lifting greater than 35 pounds. When asked whether Gustin absolutely could not do these things or whether she was able to do them but that they would cause her pain, Dr. Prostic testified that "she would not have sufficient comfort that she would stay at that job." With respect to Gustin's ability to lift, Dr. Prostic observed:

"Well, if she did it for one day that doesn't mean she can do it for a career. You know, what I used to say when I had an office on Troost was that you could blindfold me and I [could] successfully walk across Troost occasionally, but I couldn't make a career out of it."

With respect to the seven restricted activities, Dr. Prostic concluded:

"For the first two tasks I think that she is likely to sustain new injury to her spine. For the ones that required constant sitting or constant standing I think it is likely that that will aggravate her symptoms and cause her to have too many days out of work to be useful."

A week after Dr. Prostic's exam, Payless arranged for Gustin to be examined by Dr. John H. Gilbert. Dr. Gilbert found Gustin to have sustained a 5% permanent impairment to the body as a whole and that Gustin lost the ability to perform 2 of her previous 13 tasks for a task loss of 15%. He advised or suggested to Gustin that she avoid those two tasks. With respect to the job tasks involving constant standing for the majority of the work shift, he opined that this activity would probably exacerbate Gustin's symptoms.

The administrative law judge (ALJ) awarded compensation, finding that Gustin had a permanent partial disability pursuant to K.S.A. 44-510e(a). The ALJ averaged the conclusions of Drs. Pros-

tic and Gilbert on the task loss issue to find that Gustin had sustained a 34% task loss. The ALJ noted Payless' argument that if Gustin "has the physical capacity to do a job task as long as she can tolerate the pain then she has not lost the ability." The ALJ observed:

"While Respondent's argument is interesting, the Court interprets task loss as the loss of ability to perform work tasks that were performed in substantial gainful employment. In other words, Claimant may have the ability to lift fifty pounds one time but that does not mean Claimant can do this as an on-going task in substantial gainful employment."

Payless appealed to the Workers Compensation Board (Board), arguing that Gustin did not prove she lost the ability to perform work tasks. This is in spite of the fact that the two doctors who testified in this case, including Payless' examining doctor, concluded that Gustin sustained a task loss, though they disagree on the extent of the loss.

The Board explained that work disability (wage and task loss) is intended, in part, to replace wages. "It is unlikely that an employer would knowingly hire a worker to perform a job with required tasks that exceed a worker's restrictions." The loss of the ability to do work means the inability to perform a task within the restrictions recommended by a doctor.

Payless asked the Board to disregard restrictions that are merely designed to avoid pain and the possibility of future reinjury, and that the Board should only consider tasks that the injured worker cannot do regardless of the consequences.

The Board concluded: "[I]n keeping with established precedent and the plain meaning of the statute," a claimant "loses the ability to perform a work task when a credible doctor opines that the work task cannot be performed within the restrictions imposed for the work-related injury."

Here, Dr. Prostic found that Gustin cannot do 7 out of 13 tasks for a 54% task loss. Dr. Gilbert found a 15% task loss. The ALJ found both doctors to be credible and averaged the two opinions for a resulting 34% task loss. The Board affirmed the ALJ with respect to the task loss finding.

The Board found Drs. Prostic and Gilbert to be equally credible on the impairment of function. Averaging the doctors' separate findings, the Board arrived at an 8.5% functional impairment.

Payless and American Zurich Insurance Co., its insurer, appeal, claiming the Board erred in finding that Gustin suffered a task loss.

K.S.A. 2010 Supp. 44-556(a) directs that final orders of the Board are subject to review by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 *et seq*. Because the Board's order was issued after July 1, 2009, the amended KJRA controls our review of this appeal. See K.S.A. 2010 Supp. 77-621(c), (d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 182-83, 239 P.3d 66 (2010).

When reviewing the Board's factual findings, the amended KJRA does not alter the longstanding rule that our court looks at the factual findings to determine whether they are supported by substantial competent evidence, in light of the record as a whole. See K.S.A. 2010 Supp. 77-621(c), (d). However, as amended, the KJRA

"now alters an appellate court's analysis in three ways: (1) It requires review of the evidence both supporting and contradicting the Board's findings; (2) it requires an examination of the presiding officer's credibility determination, if any; and (3) it requires review of the agency's explanation as to why the evidence supports its findings." *Redd*, 291 Kan. at 182.

Even so, we do not reweigh evidence or engage in de novo review of the agency's factual findings. K.S.A. 2010 Supp. 77-621(d).

Payless renews the argument it raised before the ALJ and the Board that "when the task can still be performed and 'restrictions' are defined by the physician as only advice, suggestions or recommendations to avoid possible future problems, there has been no present loss of the ability to perform a task."

To begin with, Payless minimizes the medical testimony regarding Gustin's task loss. Rather than expressing a concern about *possible* future problems, Dr. Prostic noted that on the day he examined Gustin he was of the opinion that she could not engage in constant standing or sitting or occasionally lifting more than 35 pounds. When asked whether this was due to pain or an absolute inability to do these things, he responded, "she would not have sufficient comfort that she would stay at that job." He opined that

if Gustin attempted some of the tasks she engaged in at Payless, "I think that she is *likely* to sustain new injury to her spine. For the ones that required constant sitting or constant standing I think it is *likely* that that will aggravate her symptoms and cause her to have too many days out of work to be useful." (Emphasis added.) Similarly, Dr. Gilbert opined that constant standing for the majority of her workday would *probably* exacerbate her symptoms. Words like "probably" and "likely" express more than the mere possibility of an outcome. They express the notion that the outcome will occur more than 50% of the time.

We can imagine all sorts of circumstances in which a worker may have the ability to perform a task one time, but not many times over and certainly not on a constant daily basis if the job so requires. The whole point of physician-defined job restrictions is to limit an injured worker's job tasks to those the worker can reasonably be expected to perform on a daily basis. As Dr. Prostic aptly explained, one may be able to successfully cross a busy street while blindfolded one time, but not on a regular basis.

The exercise of measuring an injured worker's task loss is to ultimately arrive at an amount of compensation that takes into account the wages lost as a result of the worker's injury. As stated in *Blythe v. State Highway Comm.*, 148 Kan. 598, 601, 83 P.2d 678 (1938): "It can be very properly stated that the purpose of the compensation law is not to pay the workman for the injury but to compensate him in a way for his loss of earning power." Payless did not hire Gustin to do one thing one time. She was hired to do a set of tasks over and over, day in and day out. Her ability to earn wages from Payless is dependent upon her ability to perform those tasks every hour of every day of her work week. If she can perform a job task on Monday but stays home Tuesday and Wednesday because she has exacerbated her work injury in doing so, a physician may very well conclude that she has lost the ability to do the task in order to successfully perform her job.

Payless further discounts Dr. Prostic's evaluation because as an examining physician he expressed his opinion about what tasks Gustin should not do as advice to her, rather than (apparently) a command. Payless does not explain how this advice/command dis-

tinction is found in K.S.A. 44-510e(a), which merely refers to the physician's *opinion*.

Under our statute, task loss is

"the extent, expressed as a percentage to which the employee, in the opinion of the physician, has lost the ability to perform the work tasks that the employee performed in any substantial gainful employment during the fifteen-year period preceding the accident." K.S.A. 44-510e(a).

We have unlimited review of questions involving the interpretation or construction of a statute, owing "no significant deference" to the ALJ's or the Board's interpretation or construction. *Higgins v. Abilene Machine, Inc.*, 288 Kan. 359, 361, 204 P.3d 1156 (2009).

For the purpose of computing a task loss, Payless seeks a definition of "ability" which, it says, should "only exclude those tasks which a claimant can no longer physically perform due to the injury, irrespective of any physician's restrictions and regardless of the consequences." As pointed out by the Board, such a definition obscures the distinction between functional impairment (the loss of a part of the total physiological capabilities of the human body) and work disability (that portion of the job requirements that a worker is unable to perform by reason of an injury).

Payless cites a trio of recent cases that criticized older workers compensation decisions as support for the court changing course in this case: *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 214 P.3d 676 (2009); *Casco v. Armour Swift-Eckrich*, 283 Kan 508, 154 P.3d 494 (2007); and *Pruter v. Larned State Hospital*, 271 Kan. 865, 26 P.3d 666 (2001). Payless claims that these cases are signs that the "old is out and the new is in." While mentioning *Casco* and *Pruter*, Payless focuses on *Bergstrom*.

*In Bergstrom*, the Kansas Supreme Court overruled a line of cases that read a good-faith requirement into K.S.A. 44-510e(a). 289 Kan. at 609-10. The court had previously required a worker to make a good-faith attempt to mitigate lost wages though the statute did not explicitly require such an effort. The cases overruled in *Bergstrom* had added a requirement to the statute which *Bergstrom* removed. In the case now before us, however, there is no explicit statutory requirement that the worker prove task loss in the manner prescribed by Payless.

K.S.A. 44-510e(a) clearly establishes the proof necessary to establish task loss: a physician's *opinion* that the injured worker has lost the ability to perform a calculated percentage of the work tasks that the worker formerly performed while employed in the 15 years before the accident. As stated by the *Bergstrom* court, task loss is established by having a doctor "look to the tasks that the employee performed during the 15-year period preceding the accident and reach an opinion of the percentage that can still be performed." 289 Kan. at 609.

Drs. Prostic and Gilbert both reached opinions that Gustin is now unable to complete some percentage of her previous work tasks. There is no contrary evidence. Accordingly, we conclude that in light of the record as a whole, substantial evidence supports the Board's finding of task loss. Further, we find no support for Payless' restrictive definition of "ability to perform" as found in K.S.A. 44-510e(a). As a result we find no legal error in the Board's application of the statute to Gustin's injuries.

Affirmed.