No. 99,528

TODD L. MITCHELL, *Appellee/Cross-appellant*, v. PETSMART, INC., *Appellant/Cross-appellee*, ROYAL & SUN ALLIANCE INSURANCE COMPANY, *Appellee/Cross-appellee*, and TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA, *Appellant/Cross-appellee*.

(239 P.3d 51)

Opinion filed September 10, 2010.

*Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *Brian R. Collignon*, of the same firm, was with him on the briefs for appellant/cross-appellee Petsmart, Inc., and appellant/cross-appellee Travelers Property and Casualty Company of America.

*Terry J. Torline*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *Timothy A. Emerson*, of the same firm, was with him on the briefs for appellant/cross-appellee Petsmart, Inc., and appellee/cross-appellee Royal & Sun Alliance Insurance Company.

*Michael L. Snider*, of Snider & Seiwert, of Wichita, argued the cause and was on the briefs for appellee/cross-appellant Todd L. Mitchell.

The opinion of the court was delivered by

BILES, J.: This appeal comes on cross-petitions for review following a workers compensation award. Todd L. Mitchell, the injured employee, challenges the Workers Compensation Board's method for calculating his permanent partial disability award. His first issue is whether the Board erred in combining his multiple left arm and right arm injuries into a scheduled injury for each arm at the shoulder level. We hold it was error to combine these injuries. A variation of this issue is decided in *Redd v. Kansas Truck Center*, 291 Kan. 176, 239 P.3d 66 (2010).

Mitchell's second issue attacks the Board's decision to deduct the number of weeks awarded for temporary total disability from the number of weeks allotted on the K.S.A. 44-510d schedule to calculate his permanent partial disability award. We hold the Board properly deducted the weeks of temporary total disability.

Finally, each of the two insurance carriers involved seeks to shift responsibility to the other by challenging the decision to impose joint and several liability for certain injuries suffered by Mitchell. We hold the Board's order imposing joint and several liability should be affirmed because the evidence supports the Board's finding that Mitchell's repetitive trauma injuries resulted from a combination of the initial injury that began these proceedings and subsequent work activities.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are not in dispute. On December 31, 2003, Mitchell fell while working at Petsmart, Inc., and broke his left thumb. He underwent surgery and returned to work with a cast on his left arm. He did not miss any work. Mitchell's job responsibilities included building displays, transporting merchandise to the sales floor, and stocking the shelves with dog food weighing up to 50 pounds. Mitchell testified he wore the cast on his left arm for about 12 weeks but continued to complete his regular job tasks using primarily his right arm.

When Mitchell broke his left thumb, Petsmart was insured by Royal & Sun Alliance Insurance Company. But on February 1, 2004, 1 month after the injury, Travelers Property and Casualty Company of America began insuring Petsmart.

On March 2, 2004, Mitchell filed his first workers compensation claim (No. 1,015,618) against Petsmart, naming Royal as the insurer. Mitchell alleged the December 31, 2003, fall caused his work-related injury. He claimed injuries to his "hand, thumb, arm and all parts affected thereby." Later, this claim was amended to allege the date of accident for purposes of the statutory claims process included subsequent aggravations after December 31, 2003. The amendment also expanded the claimed injuries to include "bilateral hands, shoulders, arms and all other body parts affected."

On April 5, 2004, which appears to be the date the cast was removed, Mitchell was released at maximum medical improvement. He testified he continued to rely on his right arm for most lifting activities for at least another month after the cast was taken off because his left arm remained stiff and weak.

Dr. Pedro Murati examined Mitchell for complaints of left thumb and hand pain and weakness. For the left thumb, Dr. Murati determined Mitchell suffered a 20 percent impairment for lateral instability and a 14 percent impairment for loss of motion, which Dr. Murati converted to 8 and 6 percent hand impairments, respectively. He assigned an additional 12 percent hand impairment for sensory deficits in the thumb. For the weakness in Mitch-

ell's left hand, Dr. Murati assigned an 11 percent hand impairment. Dr. Murati then combined these for a total of 32 percent impairment to the left hand. He did not convert this into a left upper extremity impairment. Dr. Murati's recommended restrictions were to "work as tolerated and use common sense."

On July 18, 2004, Mitchell reported pain in his right arm. Petsmart sent Mitchell to Dr. Mark Dobyns, who treated Mitchell with Ibuprofen and a cortisone shot. Mitchell testified Dr. Dobyns restricted him from lifting more than 10 pounds with his right arm, so Mitchell switched back to primarily using his left arm to complete his job duties. Dr. Murati also evaluated Mitchell for right shoulder pain. He diagnosed probable right carpal tunnel syndrome with pain in his right shoulder, right rotator cuff sprain or tear, and right shoulder pain with instability. Dr. Murati attributed these impairments to a work-related injury occurring on July 23, 2004. This appears to be an error because July 23 does not have any other significance to this litigation. Dr. Murati probably meant to refer to the date Mitchell reported right arm pain, July 18, 2004.

On October 20, 2004, Mitchell notified Petsmart his left arm and shoulder hurt. On October 25, 2004, Mitchell filed a second claim against Petsmart and Royal (No. 1,019,828) for overuse of extremities, listing an accident date of July 18, 2004, the date Mitchell initially reported pain in his right arm and each day worked thereafter. This second claim alleged injury to "bilateral hands, shoulders, and all parts affected." Travelers was substituted later as the insurance carrier for this claim.

In November 2004, Dr. Bernard Hearon diagnosed Mitchell with a superior labum anterior to posterior (SLAP) lesion on his right shoulder, and surgery was performed in January 2005. On February 24, 2005, Dr. Hearon diagnosed a SLAP lesion on Mitchell's left shoulder and restricted overhead work on the left side. Dr. Hearon recommended surgery to treat the second SLAP lesion, but Mitchell refused.

Petsmart terminated Mitchell for poor attendance on July 19, 2005. His last day worked was July 15, 2005. The same day he was terminated, Mitchell returned to Dr. Hearon, complaining of bilateral upper extremity tingling and numbness. He was diagnosed

with bilateral carpal tunnel syndrome and possible bilateral cubital tunnel syndrome (cubital relates to the elbow). A nerve conduction test confirmed cubital tunnel syndrome for his right upper extremity. Nerve tests did not support a finding for left cubital tunnel syndrome. On August 15, 2005, Dr. Hearon performed right carpal tunnel release surgery followed by physical therapy. Mitchell was released without restrictions on September 27, 2005.

Mitchell returned to Dr. Murati on December 21, 2005, with continued complaints of right and left shoulder pain, pain in his left hand, and right hand weakness. Dr. Murati diagnosed him with a 36 percent right upper extremity impairment for the status post-right carpal tunnel release, status postright subacromial decompression, status postright distal clavicle excision, right ulnar cubital syndrome, and loss of shoulder motion. Dr. Murati then converted this to a 22 percent whole body impairment. Dr. Murati also found a 15 percent left upper extremity impairment for left carpal tunnel syndrome and mild glenohumeral crepitus of the left shoulder, which he converted to a 9 percent whole body impairment. Finally, Dr. Murati combined the 22 and 9 percent whole body calculations into a 29 percent whole person impairment. He found the injuries were caused by a work-related injury occurring on July 18, 2004 (the date the injury was reported), and every day thereafter.

*The ALJ Award*

The administrative law judge (ALJ) consolidated Mitchell's two workers compensation claims. In both cases, the parties entered into stipulations. In No. 1,015,618, pertaining to the left thumb injury, the parties agreed Mitchell injured his thumb on December 31, 2003, because of his employment. They also stipulated Mitchell's average weekly wage was $560.90, excluding fringe benefits. Petsmart and Royal denied Mitchell suffered any other injury for which they would be responsible. In the second claim, No. 1,019,828, the parties agreed that Travelers insured Petsmart during the time period at issue in the case and that Mitchell's wage was $576.32, including fringe benefits. Petsmart and Travelers did not stipulate Mitchell was injured during Travelers' coverage period.

The ALJ ordered an independent medical evaluation with Dr. Pat Do, who diagnosed: (1) status postright carpal tunnel release; (2) status postleft thumb ulnar collateral ligament repair; (3) status postright shoulder subacromial decompression, rotator cuff repair, distal clavicle excision, and SLAP repair; and (4) left shoulder pain. Dr. Do concluded that all of these injuries resulted from the December 31, 2003, left thumb break and were the natural consequence of overuse following surgery of the uninvolved extremity.

The ALJ found Mitchell suffered an injury on December 31, 2003, and provided the following description of events:

"The claimant in this case was stepping backwards to get clear of a truck of some kind that was working in the isle [sic] of the store at Petsmart. But as he stepped backwards he tripped and put out his left hand to catch himself and his left thumb was broken and bent severely. He never lost work over that particular injury even though a screw was later put in [his left hand] that was done on his days off and he continued to work and continued to use the right hand more than he did the left hand as he was favoring the left hand because of the thumb injury. From that he had several other problems including but not limited to carpal tunnel on the right hand and he had surgery on it. Then he had shoulder problems and then he had elbow problems so the whole right upper extremity and part of the left extremity had several arthroscopic surgeries and he continued to have all kinds of problems."

The ALJ then calculated Mitchell's injuries as a general body disability under K.S.A. 44-510e—instead of using the scheduled injuries set out in K.S.A. 44-510d. The ALJ then averaged the impairment ratings given by Drs. Murati and Do, which resulted in a permanent partial disability award of $85,354.09. The ALJ did not award temporary total disability.

The ALJ's order did not specifically address whether the secondary injury rule, which permits compensation for a subsequent injury if it is a natural and probable consequence of the primary injury, applied to the bilateral shoulder and right elbow injuries. But such a determination is implied in the ALJ's finding that the accident date was December 31, 2003, which is when Mitchell fell and broke his left thumb. Finally, the ALJ imposed joint and several liability on Royal and Travelers, explaining: "The law is clear that if [insurance carriers] have a disagreement among themselves as to who the responsible carrier is, that should be decided in the

District Court . . . [because] we are not authorized to make that determination in the Comp Court."

Traveler's sought review of the ALJ's order before the Board. Travelers challenged the nature and extent of Mitchell's disabilities, the joint and several liability determination, and the ALJ's failure to award a scheduled injury under K.S.A. 44-510d. Royal and Mitchell did not cross-appeal.

*The Board's Order*

The Board did not agree with the ALJ's calculations for Mitchell's injuries as a general body disability under K.S.A. 44-510e. The Board held Mitchell's injuries to both his arms and shoulders must be compensated under the schedules set out in K.S.A. 44-510d, citing *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 154 P.3d 494 (2007) (See Syllabus Paragraph 7—Scheduled injuries are the general rule and nonscheduled injuries are the exception. If an injury is on the schedule, the amount of compensation is determined under K.S.A. 44-510d.).

The Board then addressed each claimed injury. For Mitchell's left thumb, the Board found he suffered a 44.5 percent impairment and awarded Mitchell 26.70 weeks of permanent partial disability at a rate of $373.95, totaling $9,984.47. The Board found Royal solely liable for the left thumb injury award. This finding is not challenged on appeal. For the remaining injuries, the Board found Mitchell suffered repetitive trauma injuries, including bilateral carpal tunnel syndrome, right cubital tunnel syndrome, and bilateral shoulder injuries. The Board explained that when Mitchell returned to work after the thumb surgery, he used his right arm to unload pallets of dog food until the right arm became symptomatic. Then, Mitchell went back to using his left arm to compensate for the right shoulder pain, and the left arm also became symptomatic.

The Board also expressly found Mitchell's arm and shoulder injuries, which occurred after he broke his left thumb, resulted from a combination of Mitchell's work duties and his initial thumb injury. The Board referenced Dr. Murati's testimony as establishing Mitchell's routine work activities contributed to his subsequent in-

juries. It also cited Mitchell's and Dr. Do's testimony that the left thumb break was a contributing factor. The Board held:

"[I]t cannot be said those additional repetitive trauma injuries to claimant's arms and shoulders would have occurred without the strenuous work that claimant performed after his thumb surgery. Likewise, it cannot be said claimant would have developed these injuries without the initial thumb injury. Consequently, the Board finds and concludes *the combination of claimant's work activities and his initial thumb injury resulted in claimant developing bilateral carpal tunnel syndrome, right elbow symptoms, and bilateral shoulder injuries.*" (Emphasis added.)

But the Board disagreed over how to calculate Mitchell's compensation. A majority combined the separate injuries to each upper extremity and then made one award each for the right and left upper extremities. They listed the date of injury as Mitchell's last day worked, July 15, 2005. For the right upper extremity, the Board awarded $29,238.19—$6,706.44 temporary total disability benefits and $21,651.86 permanent partial disability benefits. Mitchell was awarded $6,706.44 in permanent partial disability for his left upper extremity.

Two dissenters disagreed with the majority's method of combining injuries. They argued Mitchell's disabilities should be calculated at each level specified in the statutory schedule that contained an injury because K.S.A. 44-510d does not contain any language authorizing the Board to combine injuries. Under the minority's approach, each injury to the fingers, hand, forearm, arm, and shoulder would be compensated separately under the schedule regardless of whether the injuries occur separately, simultaneously, or are progressive. This disagreement over combining impairments under K.S.A. 44-510d when there are multiple injuries to scheduled members is a recurring controversy. See *Redd,* slip op. at 13-27.

Finally, the entire Board agreed with the ALJ and ordered joint and several liability against Royal and Travelers for the medical treatment and disability compensation for Mitchell's bilateral carpal tunnel syndrome, right elbow symptoms, and bilateral shoulder injuries. The Board reasoned that joint and several liability was appropriate based on its factual finding that Mitchell's initial left thumb injury and subsequent work activities combined to cause those injuries.

Travelers appealed. It contended the Board erred by finding more than one date of injury, arguing the secondary injury rule applied and that Mitchell's extremity impairments were the natural and probable consequence of the left thumb injury. This error, Travelers claimed, led the Board to mistakenly impose joint and several liability on Travelers and Royal because Royal was the insurer at risk when the left thumb was broken. Mitchell filed a cross-appeal. He argued the dissenting board members were correct in finding he should have received separate awards at each injury level and the Board majority erred by combining his injuries to the highest level for the right and left extremities on the statutory schedule. He also claimed the Board erred by deducting the weeks of temporary total disability from the 225 weeks allotted on the schedule.

The Court of Appeals held: (1) The secondary injury rule did not apply because there was sufficient evidence supporting the Board's decision that a combination of the left thumb break and Mitchell's subsequent work activities caused his injuries; (2) it was appropriate to combine Mitchell's extremity impairments to the highest level of the extremity because the K.S.A. 44-510d schedule is progressive, *i.e.*, the higher up the extremity the more weeks are awarded; and (3) K.A.R. 51-7-8 allows for the credit of temporary total disability paid when a claimant is awarded those temporary benefits followed by a permanent partial disability. *Mitchell v. Petsmart, Inc.*, 41 Kan. App. 2d 523, 203 P.3d 76 (2009). The *Mitchell* panel also affirmed the joint and several liability imposed on the two insurance carriers, presumably because the panel believed its decision on the secondary injury rule resolved that controversy. But the panel's decision is not specific as to this point.

Both Travelers and Mitchell filed petitions for review, which we granted. Jurisdiction is proper under K.S.A. 20-3018(b) (review of a Court of Appeals' decision).

We address the issues raised in the following order: (1) whether the Board erred in calculating Mitchell's permanent partial disability award by combining his extremity impairments to the highest level of the extremity; (2) whether the Board erred by deducting Mitchell's temporary total disability in calculating his permanent

partial disability; and (3) whether the Board erred by assigning joint and several liability to both Royal and Travelers.

## ISSUE ONE: PERMANENT PARTIAL DISABILITY CALCULATION

Mitchell argues the Board majority improperly combined his multiple left and right arm injuries into one scheduled injury for each arm at the shoulder level. Instead, Mitchell argues his injuries should have been compensated separately according to the schedule in K.S.A. 44-510d at the level corresponding to each injury. Travelers asserts it was proper to combine these injuries into two awards, noting the number of weeks assigned to each arm at the shoulder level on the statutory schedule includes the value of the lower members.

The *Mitchell* panel agreed with Travelers. 41 Kan. App. 2d at 537. But the Board has used, and other Court of Appeals panels have affirmed, conflicting methods for calculating an award under similar circumstances. See, *e.g.*, *Redd v. Kansas Truck Center*, 2008 WL 4149955, at *12 (Work. Comp. Bd., No. 1,020,892, filed August 27, 2008); *Conrow v. Globe Engineering Co.*, No. 99, 718, unpublished Court of Appeals opinion filed March 13, 2009. This statutory interpretation issue is a question of law over which we have unlimited review. See *Redd*, 291 Kan. at 187; *Ft. Hays St. Univ. v. University Ch., Am. Ass'n of Univ. Profs*, 290 Kan. 446, 457, 228 P.3d 403 (2010).

The *Mitchell* panel interpreted K.S.A. 44-510d to allow compensation at the highest level of injury when multiple injuries occur within a single extremity. It noted the statutory structure of the scheduled injuries is progressive, meaning an injured worker is entitled to more weeks if the injury occurs at a higher level, *i.e.*, 200 weeks for a forearm, but 210 weeks for the loss of an arm. 41 Kan. App. 2d at 537-38. The panel also relied upon *Casco*, 283 Kan. at 522, which found that if an injury is on the schedule, the amount of compensation stated in the statutory schedule includes compensation for the complete loss of the member or the partial loss of the member. The panel then reasoned that because the number of weeks is reduced by the percentage of the loss, "the principle of compensating an extremity at the highest level affected

applies regardless of whether the loss is total or partial." 41 Kan. App. 2d at 537. In the end, this justified the Board majority's statutory interpretation, which the *Mitchell* panel found was entitled to judicial deference. 41 Kan. App. 2d at 538.

But in *Redd*, a Board majority awarded an injured worker five scheduled injuries to his left hand, left forearm, left arm, right forearm, and right arm. The employer argued the Board was required to combine the individual impairment ratings into a whole body impairment because K.S.A. 44-510d(a)(23) requires loss of a scheduled member be based on the permanent impairment of function to that member as determined using the American Medical Association Guides to Evaluation of Permanent Impairment (4th ed. 1995) (Guides). The Guides instruct physicians to generate a whole body impairment rating as part of a recommended three-step evaluation process. We agreed that this created an ambiguity in the statute, but we rejected the employer's statutory interpretation in *Redd*, 291 Kan. at 194, because it rendered meaningless the statutory schedules set out in K.S.A. 44-510(d)(a)(1)-(22) .

To reach this conclusion, we analyzed the governing statutes from the Workers Compensation Act, K.S.A. 44-501 *et seq.*; the case law interpreting those statutes; the Guides; and the legislative history for K.S.A. 44-510(d)(a)(23). We found the legislature created its own statutory mechanism to calculate permanent partial disability awards in K.S.A. 44-510d and K.S.A. 44-510e. Thus, the more reasonable interpretation for K.S.A. 44-510d(a)(23) was that the legislature meant to adopt the evaluation requirements and methods for combining impairments to the same statutorily specified level, but not the Guides' process for combining multiple scheduled injuries occurring at different levels or on different members. *Redd*, 291 Kan. at 196.

For example, if there are several injuries causing impairment to an injured worker's thumb, those injuries should be combined to generate a total impairment to the thumb because it is specifically identified in K.S.A. 44-510d. But the thumb injury should not be combined with a scheduled injury to the hand, which also is specifically identified in the statute. This view, we reasoned in *Redd*, 291 Kan. at 198, maintains the Guides' purpose of bringing greater

objectivity to the physician's task of estimating the magnitude of permanent impairments but also allows for application of the scheduled injury calculations specified in the statute. See K.S.A. 44-510d(a)(1)-(22).

In *Redd*, we also touched on the *Mitchell* panel's decision to combine impairments to the highest level of the extremity, by stating:

"Admittedly, [the *Mitchell*] approach does not render the statutory schedule meaningless, but it does read something into K.S.A. 44-510d(a)(1)-(22) that does not exist. *The schedule does not contain any language requiring the combination of scheduled injuries, and the panel does not explain where it finds the authority permitting the Board to combine injuries in the manner the panel approved.*" (Emphasis added.) *Redd*, 291 Kan. at 198.

While in *Redd* we found that the adoption of the Guides in K.S.A. 44-510d(a)(23) created an ambiguity in the statute, the schedule's plain language helps us resolve the arguments made by Travelers and adopted by the Court of Appeals' panel in this case. See *Higgins v. Abilene Machine, Inc.*, 288 Kan. 359, 362, 204 P.3d 1156 (2009) (Canons of statutory construction are used to resolve an ambiguity only if the plain reading of a statute yields an ambiguity or lack of clarity.). We find the statutory schedule plainly does not authorize the combining of impairment values to be found for the specific scheduled members identified in K.S.A. 44-510d(a)(1)-(22).

K.S.A. 44-510d defines a permanent partial disability as a disability "partial in character but permanent in quality." K.S.A. 44-510d(a) then states permanent partial disability compensation "is to be paid for not to exceed the number of weeks allowed" in the following schedule:

"(1) For the loss of a thumb, 60 weeks.

. . . .

"(12) For the loss of a forearm, 200 weeks.

"(13) For the loss of an arm, excluding the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures, 210 weeks, and for the loss of an arm, including the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures, 225 weeks.

. . . .

"(21) Permanent loss of the use of a finger, thumb, hand, shoulder, arm fore-arm, toe, foot, leg or lower leg . . . shall be equivalent to the loss thereof. *For the permanent partial loss of the use of a finger, thumb, hand, shoulder, arm, toe, foot or leg, or the sight of an eye or the hearing of an ear, compensation shall be paid as provided for in K.S.A. 44-510c . . . per week during that proportion of the number of weeks in the foregoing schedule provided for the loss of such finger, thumb, hand, shoulder, arm, toe, foot or leg, or the sight of an eye or the hearing of an ear, which partial loss thereof bears to the total loss of a finger, thumb, hand, shoulder, arm, toe, foot or leg, or the sight of an eye or the hearing of an ear*; but in no event shall the compensation payable hereunder for such partial loss exceed the compensation payable under the schedule for the total loss of such finger, thumb, hand, arm, toe, foot or leg, or the sight of an eye or the hearing of an ear, exclusive of the healing period. As used in this paragraph (21), 'shoulder' means the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures." (Emphasis added.)

There are three relevant points apparent from the statute. First, it does not contain a provision treating multiple injuries differently than singular injuries. Second, it also does not expressly provide for the combination of impairment values. Third, K.S.A. 44-510d(a)(21) states that the permanent partial loss of the "finger, thumb, hand, [arm, or shoulder]" shall be compensated by the number of weeks which the "partial loss thereof bears to the total loss of [the] finger, thumb, hand, [arm, or shoulder] . . . ." It does not provide that the permanent partial loss shall be compensated by the percentage of loss of the extremity.

Unlike the arguments made in *Redd*, the *Mitchell* panel did not rely upon the adoption of the Guides as justification for combining impairments. It found the statute's progressive nature, which allots more weeks for the higher levels of the extremity, justified the Board majority's decision to combine Mitchell's injuries under the operative construction doctrine, which allows judicial deference to an administrative agency's statutory interpretation when it is supported by a rational basis. *Mitchell*, 41 Kan. App. 2d at 537-38.

But this ignores this court's recent decisions recognizing there is little utility for such deference given the long-standing admonition that appellate courts are always free to substitute their judgment for that of the administrative agency when reviewing a question of law. *Ft. Hays St. Univ.*, 290 Kan. at 457 ("In this matter, an appellate court exercises unlimited review on the determinative

question of statutory interpretation without deference to [the agency's] view as to its own authority."); *Higgins*, 288 Kan. at 361 ("No significant deference is due [an administrative law judge's] or the [Workers Compensation] Board's interpretation or construction of a statute."). Indeed, when an agency applies the same statute in conflicting ways, as the Board has on this question, any judicial deference is stymied. *Redd*, 291 Kan. at 188. Therefore, the *Mitchell* panel's rationale is not compelling.

Travelers presents a better argument in its brief by contending that the number of weeks contained on the schedule compensates the injured worker for the complete loss of the body member. For example, when a claimant suffers an amputation at the level of the shoulder, the 225 weeks on the schedule necessarily includes the loss of the entire arm. Since the number of weeks for the complete loss is simply reduced by the percentage of loss in partial loss cases, Travelers argues the number of weeks assigned to the highest level must include the lower parts of the member. But this argument also fails because it is contrary to the plain language of the statute and reads a rule into the schedule that does not exist.

We find the Act requires that an injured worker is entitled to an award at each separate level for multiple injuries to the same extremity corresponding to the statutory schedule set out in K.S.A. 44-510d. *Redd*, 291 Kan. 176, Syl. ¶ 5. We reverse the Board's and the Court of Appeals' determinations combining the multiple scheduled injuries/impairments to the same extremity, and this case is remanded to the Board for a recalculation of Mitchell's award consistent with this opinion.

ISSUE TWO: THE PERMANENT PARTIAL DISABILITY REDUCTION

Mitchell was awarded 18 weeks of temporary total disability for injuries sustained to his right upper extremity. He also received a permanent partial disability award. Under the K.S.A. 44-510d(a)(13) schedule, an injured worker is typically awarded 225 weeks for the loss of the arm at the shoulder. In calculating Mitchell's permanent partial disability award, the Board first reduced the 225 weeks assigned under K.S.A. 44-510d(a)(13) by the 18 weeks of temporary total disability. Then, the Board multiplied the re-

duced weekly total by Mitchell's functional impairment rating. Mitchell argues it was improper to deduct the 18 weeks of temporary total disability.

K.A.R. 51-7-8(b)(1) expressly provides for this deduction. But Mitchell argues a different interpretation to the regulation, citing the preceding section, K.A.R. 51-7-8(a)(1), to contend the regulation was misapplied. K.A.R. 51-7-8 states in relevant part:

"(a)(1) If a worker suffers a loss to a member and, in addition, suffers other injuries contributing to the temporary total disability, compensation for the temporary total disability shall not be deductible from the scheduled amount for those weeks of temporary total disability attributable to the other injuries.

. . . .

"(b) If a healing period of 10% of the schedule or partial schedule is granted, not exceeding 15 weeks, it shall be added to the weeks on the schedule or partial schedule before the following computations are made.

(1) *If a loss of use occurs to a scheduled member of the body, compensation shall be computed as follows*:

(A) *deduct the number of weeks of temporary total compensation from the schedule*;

(B) multiply the difference by the percent of loss or use to the member; and

(C) multiply the result by the applicable weekly temporary total compensation rate." (Emphasis added.)

Mitchell claims K.A.R. 51-7-8(a)(1) pertains to workers with both scheduled and nonscheduled injuries and that it prohibits the deduction of temporary total disability paid from a claimant's permanent partial disability award for the scheduled member. We agree the plain language of K.A.R. 51-7-8(a)(1) prohibits the deduction of temporary total disability from the permanent partial disability award—if the temporary total is caused by both a scheduled injury and some other injury. But these are not the facts in this case because all of Mitchell's injuries are scheduled. Mitchell's argument misses the relevant point that K.A.R. 51-7-8(b)(1) explicitly provides for the calculation employed in his case when a loss of use occurs to a scheduled member, which is what happened here. We find Mitchell's argument to be without merit under these facts.

In the alternative, Mitchell argues K.A.R. 51-7-8 is void because allowing the deduction for temporary total disability paid contra-

dicts K.S.A. 44-510c and K.S.A. 44-510d. The *Mitchell* panel upheld the Board's calculation, finding K.A.R. 51-7-8 was a valid regulation and the deduction of the temporary total disability weeks approved by previous case law, citing another Court of Appeals decision, *Cowan v. Josten's American Yearbook Co.*, 8 Kan. App. 2d 423, 427, 660 P.2d 78 (1983). *Mitchell*, 41 Kan. App. 2d at 538-39. We note a second Court of Appeals panel addressed this issue in a later decision and adopted the same conclusion. *Barbury v. Duckwall Alco Stores*, 42 Kan. App. 2d 693, Syl. ¶ 3, 215 P.3d 643 (2009).

Regulations an administrative agency is authorized to adopt are presumed valid, and the party challenging a regulation bears the burden to establish its invalidity. *In re Tax Appeal of City of Wichita*, 277 Kan. 487, 495, 86 P.3d 513 (2004). It is undisputed the director of workers compensation is authorized to adopt regulations administering and enforcing the Act. K.S.A. 44-573 and K.S.A. 74-717. The only remaining issue then is whether the regulation is inconsistent with the relevant statutes. Because Mitchell received temporary total disability followed by an award for permanent partial disability, the relevant statues are K.S.A. 44-510c and K.S.A. 44-510d.

K.S.A. 44-510c governs compensation for temporary and permanent total disability. It states a claimant can only receive medical benefits during the first week the claimant is totally disabled, unless the claimant is disabled a minimum of 3 weeks. After the first week, "weekly payments shall be made during such temporary total disability." K.S.A. 44-510c(b)(1). K.S.A. 44-510c(c) then states that the scheduled injury statute, K.S.A. 44-510d, governs when a permanent total or temporary total disability is followed by a permanent partial disability contained on the schedule.

As discussed above, K.S.A. 44-510d governs compensation to injured workers who are permanently, but not totally, disabled—if their injury appears on the schedule. It begins by restricting an injured worker to medical benefits during the first week of injury. Thereafter, compensation is to be paid according to the schedule, and the award is calculated using the statutorily provided formula. The statute then goes on to state disability is presumed to exist

immediately after the injury if permanent disability is awarded and ."compensation is to be paid for *not to exceed the number of weeks allowed in the following schedule.*" (Emphasis added.) K.S.A. 44-510d(a). K.S.A. 44-510d(b) provides:

"Whenever the employee is entitled to compensation for a specific injury under the foregoing schedule, *the same shall be exclusive of all other compensation except the [medical] benefits provided . . ., and no additional compensation shall be allowable or payable for any temporary or permanent, partial or total disability.*" (Emphasis added.)

The *Barbury* panel did a persuasive job of reconciling these statues. It began by noting the injured worker clearly was entitled to temporary total disability under K.S.A. 44-510c, but that the statute directed the Board to K.S.A. 44-510d to calculate the award. The panel continued by explaining that K.S.A. 44-510d indicates the disability exists immediately following the injury. This suggests the number of weeks on the schedule encompasses the entire award for an injury to that scheduled member. Further, the panel reasoned the concluding statement in the statute that compensation is not to exceed the number of weeks on the schedule further emphasizes that the number of weeks contained on the schedule is designed to cover the entire award for an injury to a member, whether it is calculated as a total or a permanent award. 42 Kan. App. 2d at 697.

In *Barbury*, the injured worker received temporary total disability followed by permanent partial disability to his leg. The panel's analysis concluded:

"[T]he legislature has set an overall compensation limit for a scheduled injury to the leg of 200 weeks, part of which may have been provided as a temporary-total-disability compensation under K.S.A. 44-510c. Although K.S.A. 44-510c lets the employee receive temporary-total-disability compensation, it defers to K.S.A. 44-510d to determine compensation when a permanent scheduled injury follows a temporary total disability. And K.S.A. 44-510d explicitly provides that the compensation provided there 'shall be exclusive of all other compensation' except medical benefits and amputation cases." 42 Kan. App. 2d at 697.

We find this reasoning logically follows the statutory language. K.A.R. 51-7-8 is in keeping with that reasoning.

But Mitchell poses a final challenge to this view by urging this court to contrast these provisions with K.S.A. 44-510e, which establishes how an unscheduled permanent partial disability award is calculated. That provision requires the deduction of temporary total disability in the following calculation:

"(2) find the number of disability weeks payable by subtracting from 415 weeks the total number of weeks of temporary total disability compensation was paid, excluding the first 15 weeks of temporary total disability compensation that was paid, and multiplying the remainder by the percentage of permanent partial general disability as determined under this subsection [a]." K.S.A. 44-510e(a)(2).

Admittedly, this is a very clear instruction, and the above analysis of K.S.A. 44-510c and K.S.A. 44-510d is more difficult. But as the *Barbury* panel considered, this distinction is not surprising based on the differences in these statutory schemes. 42 Kan. App. 2d at 698. K.S.A. 44-510e provides detailed instructions on how to calculate general body disability awards, *i.e.*, injuries not on the schedule. K.S.A. 44-510c and K.S.A. 44-510d do not. Without doubt, the legislature could have made the instructions for calculating a scheduled injury more explicit, but that does not alter the analysis suggesting the legislature intended deducting temporary total disability awards. As such, K.A.R. 51-7-8 does not violate the statutes.

The Board did not err by reducing the number of weeks assigned for Mitchell's permanent partial disability award by the number of weeks of temporary total disability awarded.

### ISSUE THREE: JOINT AND SEVERAL LIABILITY

As discussed above, the Board found that both the overcompensation for the initial injury and the sustained repetitive work over a longer period of time after that injury combined to cause Mitchell's left and right extremity impairments. It assigned Mitchell's last day worked as the date of accident under the Act. But Travelers argues the secondary injury rule applies, which would make the date of accident under the statute December 31, 2003—the date Mitchell suffered the initial thumb injury. The issue underlying this argument is which insurance carrier is liable. Travelers believes that if the secondary injury rule applies the date of accident is

within Royal's coverage period. We first consider whether the secondary injury rule applies.

Travelers argues the subsequent bilateral shoulder, carpal tunnel, and right elbow injuries flowed as a direct and natural result from the original thumb injury. Citing Dr. Do's testimony, Travelers claims the facts show the residual effect from the initial left thumb injury led to the right upper extremity injury, which in turn led to the left upper extremity injury. Travelers argues the secondary injury rule applies because the subsequent injuries were the natural and probable consequence of the left thumb break, so the date of injury for all impairments was the date the left thumb broke.

Royal argues the subsequent injuries were new and distinct. Royal notes Mitchell began developing bilateral hand numbness 7 months after the break, even though Travelers claims Mitchell was overusing the right extremity as a result of trying to protect his initial thumb injury. Royal finds support for these arguments in the testimony of Mitchell and Dr. Murati. Royal further notes Mitchell was released to return to work with no cast and no restrictions on April 15, 2005, which was 2 months before Mitchell first noticed right extremity problems.

In dealing with Travelers' arguments, the *Mitchell* panel held the secondary injury rule did not apply because there was sufficient evidence supporting the Board's decision that a combination of the thumb injury and Mitchell's subsequent work activities caused his injuries. Therefore, the panel concluded the Board did not err in determining the dates of accident for each of Mitchell's repetitive trauma injuries were separate and distinct from the date of accident for his initial thumb injury. 41 Kan. App. 2d at 533.

As to the evidence regarding the cause of Mitchell's subsequent injuries, the panel found Travelers mistaken in its arguments that the evidence was undisputed. The panel noted Dr. Do's testimony, which Travelers relies upon, was arguably inconsistent and contradicted by other medical testimony that concluded Mitchell's subsequent injuries resulted from both the left thumb break and repetitive mini traumas each day he engaged in work activities. See 41 Kan. App. 2d at 531-33. The panel concluded:

"[C]ontrary to Travelers' suggestion, the Board did not ignore evidence establishing that Mitchell's repetitive trauma injuries were the natural and probable consequence of the initial thumb injury. *Instead, the Board found that repetitive work and overcompensation contributed equally to cause Mitchell's injuries.*" (Emphasis added.) 41 Kan. App. 2d at 533.

We apply the standard of review applicable at the time of the agency action under review. K.S.A. 77-621(a)(2); see K.S.A. 2009 Supp. 77-621(a)(2); *Redd,* 291 Kan. 176, Syl. ¶ 1. At the time at issue in this appeal, K.S.A. 77-621(c)(7) required review of the agency's factual determinations for evidence "that is substantial when viewed in light of the record as a whole." Caselaw defines substantial evidence as evidence possessing something of substance and relevant consequence to induce the conclusion that the award was proper, furnishing a basis to act from which the issue raised could be easily resolved. *Graham v. Dokter Trucking Group,* 284 Kan. 547, 553-54, 161 P.3d 695 (2007). Under this analysis, the Board's decision should be upheld if supported by substantial evidence, even though there is other evidence in the record supporting contrary findings. 284 Kan. at 554.

We agree with the Court of Appeals panel and hold the Board's findings are supported by substantial competent evidence in light of the record as a whole. As correctly noted by the panel, Dr. Do's opinion was conditioned on factors that both Mitchell and other medical experts disputed. The Board made a factual determination based upon that disputed testimony, which we will not disturb on appeal based on this record. The evidence supports a finding that Mitchell's subsequent bilateral shoulder, carpal tunnel, and right elbow injuries were the combined result of both repetitive work and overcompensation use from the initial thumb injury. Now we must determine the date of accident under the statutory scheme.

K.S.A. 2009 Supp. 44-508(d), which was amended effective July 1, 2005 (L. 2005, ch. 55, sec. 1), and was thus applicable prior to Mitchell's last day worked, establishes the date of accident for work-related injuries caused by a series of events, repetitive use, cumulative traumas, or microtraumas. It states:

"[T]he date of accident shall be the date the authorized physician takes the employee off work due to the condition or restricts the employee from performing

the work which is the cause of the condition. In the event the worker is not taken off work or restricted as above described, then the date of injury shall be the earliest of the following dates: (1) The date upon which the employee gives written notice to the employer of the injury; or (2) the date the condition is diagnosed as work related, provided such fact is communicated in writing to the injured worker. In cases where none of the above criteria are met, then the date of accident shall be determined by the administrative law judge based on all the evidence and circumstances; and in no event shall the date of accident be the date of, or the day before the regular hearing."

Kansas appellate courts have set as a bright-line rule that in repetitive microtrauma situations like carpal tunnel syndrome, the date of injury is the last day worked. See *Kimbrough v. University of Kansas Med. Center*, 276 Kan. 853, 855-57, 79 P.3d 1289 (2003). The Board's decision to set the date of accident for Mitchell's repetitive trauma injuries as his last day worked is in agreement with the statute and our case law. We hold the Board correctly recognized the date of accident for Mitchell's subsequent injuries (other than the initial left thumb) as July 15, 2005, *i.e.*, Mitchell's last day of work for Petsmart. Given this particular factual scenario, we next consider the Board's decision to impose joint and several liability.

Royal argues its coverage ended on January 31, 2004. It claims it would be unfair to impose joint and several liability when Royal no longer had a contractual obligation to provide coverage, especially since Mitchell's wage had increased and any benefits awarded would be higher than anticipated by the premium collected from Petsmart. Royal also argues joint and several liability cannot be imposed because the Kansas Workers Compensation Act does not provide for it. The Board found the injuries to Mitchell's left thumb and the repetitive activities he engaged in for his work combined to cause Mitchell's subsequent bilateral shoulder, carpal tunnel, and right elbow injuries.

The *Mitchell* panel treated Travelers' and Royal's challenges to joint and several liability as separate issues for each insurer. It refused to address Royal's argument that Travelers was solely responsible because Royal failed to file a cross-appeal, depriving the panel of jurisdiction to consider this argument under K.S.A. 60-2103(h) (appellee must file notice of cross-appeal from adverse rulings in order to obtain appellate review of those issues). 41 Kan.

App. 2d at 528. We note Royal also did not seek this court's review of the panel's jurisdictional determination. Therefore, we have no jurisdiction to hear any challenge to the joint and several liability order as it relates to Royal's arguments because it failed to appeal from the Board's ruling.

Turning to Travelers' argument, the insurance carrier predicates its entire attack against the Board's joint and several liability holding on the basis of its factual dispute with the Board's decision that Mitchell's subsequent injuries resulted from both the initial thumb injury and regular job activities. But we have upheld the Board's factual determinations, so Travelers' premise fails at its starting point. The argument is without merit.

Finally, we agree generally with the notion expressed by the ALJ and in the case law that insurance carriers should not litigate disputes about their respective liabilities for the compensation awarded to an injured worker in the compensation proceedings. Instead, these matters should be decided in separate proceedings between the carriers brought for such purposes and outside the Board's jurisdiction. See *Kuhn v. Grant County*, 201 Kan. 163, Syl. ¶¶ 3-5, 439 P.2d 155 (1968) (discussing the hardship that may confront a claimant when insurance carriers litigate claims and equities existing between themselves during the injured worker's compensation process); *Hobelman v. Krebs Construction Co.*, 188 Kan. 825, 830-33, 366 P.2d 270 (1961) (where employee of two employers is injured, degrees of liability between employers and their carriers are not to be decided in workers compensation proceedings); *Tull v. Atchison Leather Products Co.*, 37 Kan. App. 2d 87, 93-94, 150 P.3d 316 (2007) (not an erroneous application of law when an ALJ or the Board embraces the general rule stated in *Kuhn*).

We affirm the Board's judgment assigning joint and several liability to Royal and Travelers.

## CONCLUSION

We reverse the Board and the Court of Appeals in their determinations that Mitchell's multiple injuries should be combined at the highest level of the scheduled injury. Instead, the Board is

required to calculate Mitchell's permanent partial disability as separate injuries under the schedule set out in K.S.A. 44-510d, as more fully explained in this opinion and *Redd v. Kansas Truck Center*, 291 Kan. 176, 239 P.3d 66 (2010). We remand the case for the purpose of making that recalculation consistent with this ruling.

We affirm the Board's deduction of the weeks of Mitchell's temporary total disabilities benefits from the permanent partial disability award.

We affirm the Board's factual findings that Mitchell's subsequent repetitive trauma injuries resulted from the combination of his work activities and his initial thumb injury. We also affirm the Board's decision to assign joint and several liability to both Royal and Travelers for Mitchell's subsequent bilateral shoulder, carpal tunnel, and right elbow injuries.

Affirmed in part, reversed in part, and remanded with directions.

DAVIS, C.J., not participating.